UNITED STATES of America, Appellee,

v.

Carl Angelo DeLUNA, Appellant.

UNITED STATES of America, Appellee,

v.

Carl James CIVELLA, Appellant.

UNITED STATES of America, Appellee,

v.

Charles David MORETINA, Appellant.

UNITED STATES of America, Appellee,

v.

Carl Wesley THOMAS, Appellant.

UNITED STATES of America, Appellee,

v.

Anthony CHIAVOLA, Sr., Appellant.

UNITED STATES of America, Appellee,

v.

Carl James CIVELLA, Appellant.

Nos. 83–2408 to 83–2411, 83–2462
and 84–1047.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 10, 1984.

Decided May 10, 1985.

Rehearing Denied July 9, 1985 in Nos.
83–2408 to 83–2410, 83–2462
and 84–1047.

Rehearing and Rehearing En Banc
Denied July 12, 1985
in No. 83–2411.

898

Nevada gaming establishment, and conspiring with others to accomplish these ends in violation of 18 U.S.C. §§ 2, 371, 1952, 2314 (1982). For reversal appellants argue that the district court erred in (1) refusing to grant their motions for judgment of acquittal (Travel Act violations), (2) upholding the validity of a search warrant issued by an allegedly partial magistrate, (3) admitting co-conspirators' written statements, (4) admitting evidence in violation of appellants' confrontation rights, (5) permitting government witness Agosto to testify in separate installments, (6) excluding expert testimony, (7) admitting evidence of other crimes and bad acts, (8) giving a Pinkerton instruction to the jury, (9) refusing to grant their motions for dismissal of the conspiracy count on the grounds of prejudicial variance between the indictment and the government's proof, (10) denying their motions for severance, (11) refusing to dismiss on the grounds of statutory and constitutional speedy trial violations, and (12) refusing to grant their motions for acquittal because of insufficient evidence. Not all appellants join in each allegation of error. For the reasons discussed below, we affirm the judgments of the district court.

Ephraim Margolin, San Francisco, Cal., Melvyn L. Segal, Chicago, Ill., and Oscar B. Goodman, Las Vegas, Nev., for appellant.

Edward D. Holmes, Justice Dept., Kansas City, Mo., for appellee.

Before McMILLIAN, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and ARNOLD, Circuit Judge.

McMILLIAN, Circuit Judge.

Carl Wesley Thomas, Carl Angelo DeLuna, Carl James Civella, Charles David Moretina, and Anthony Chiavola, Sr., appeal from a final judgment entered in the District Court[1] for the Western District of Missouri upon a jury verdict finding them guilty of knowingly transporting stolen money in interstate commerce, travelling in and utilizing the facilities of interstate commerce with the intention of establishing and managing an unlawful interest in a

On November 5, 1981, eleven defendants were charged in a seventeen-count indictment with conspiracy and substantive offenses in violation of 18 U.S.C. §§ 2, 371, 1952, 2314. Charges against six of the eleven defendants were dismissed or disposed of in proceedings separate from the trial where the five appellants in this case were convicted. Defendant Nick Civella died before trial. Defendants Donald Joe Shepard, Billy Clinton Caldwell and Joseph Vincent Agosto entered guilty pleas before trial. (Agosto, now deceased, was the government's principal witness against the other defendants.) Defendant Carl Caruso participated in the trial for a short time and then entered a guilty plea. Defendant Peter Joseph Tamburello was acquitted.

---

1. The Honorable Joseph E. Stevens, Jr., United States District Judge for the Eastern and Western Districts of Missouri.

Appellant Thomas was convicted on one count of conspiracy, six counts of interstate transportation of stolen property, and three counts of violation of the Travel Act. He was sentenced to a total of fifteen years in prison.

Appellant DeLuna was convicted of one count of conspiracy, seven counts of interstate transportation of stolen property, and five counts of violation of the Travel Act. He was sentenced to a total of thirty years in prison and probation for five years following the imprisonment.

Appellant Civella was convicted of one count of conspiracy, six counts of transportation of stolen property, and two counts of violation of the Travel Act. He was sentenced to a total of thirty years in prison.

Appellant Moretina was convicted of one count of conspiracy and three counts of interstate transportation of stolen property. He was sentenced to a total of twenty years in prison and five years probation following the imprisonment.

Appellant Chiavola was convicted of one count of conspiracy and one count of interstate transportation of stolen money. He was sentenced to a total of fifteen years in prison.

All appellants were assessed heavy fines and ordered to pay the costs of the prosecution and to make restitution to the Tropicana Hotel and Country Club.

During the period covered by the indictment (January 1, 1975, to April 1, 1979), the state of Nevada required that persons conducting gaming operations be licensed in accordance with state law and regulations. See Appendix. Any person who owned, managed, or operated a gambling casino, or received directly or indirectly a share of the moneys played therein, had to make his identity known to Nevada gaming authorities and had to be licensed. Key employees, that is, persons who had significant influence over casino management, were required to be licensed. Certain employees, including managers, were required to obtain work permits. Persons who had been convicted of felonies, had poor reputa-

tions, or were excluded by law from casinos, and others known to associate with such persons were not likely to be licensed. Donald Shepard and Billy Caldwell were licensed with respect to the Tropicana casino in Las Vegas. Carl Thomas was licensed with respect to his own casinos, Bingo Palace and Slots-of-Fun. None of the other defendants charged in the indictment was licensed or had been issued a work permit.

The government charged and sought to prove that the defendants conspired to gain control over the casino operations at the Tropicana Hotel and Country Club in Las Vegas, Nevada, in order to "skim" money from the casino by removing cash before it was counted or reported and to transport this skimmed money in interstate commerce. The evidence consisted primarily of the testimony of co-conspirator Joseph Agosto, tape recordings, notes made by DeLuna and other defendants, surveillance testimony by FBI agents, testimony of Tropicana officials, and stipulations. The events described below are based primarily on Agosto's testimony.

Agosto met with Carl DeLuna and Nick and Carl Civella in January 1975 to discuss means by which Agosto could infiltrate and obtain control of the Tropicana so that Agosto could eventually skim money from the casino. DeLuna and the Civellas told Agosto that they would see to it that a Teamsters loan to Tropicana's part-owner Deil Gustafson would be disapproved in order to facilitate Agosto's takeover. The Tropicana at the time was in serious financial trouble. Agosto purchased the Folies Bergere, the successful floor show at the Tropicana, and used this as a base to acquire influence over casino operations.

Agosto, a convicted felon, knew he could never be licensed by the Nevada gaming authorities. The Civellas were in the "Black Book" of persons excluded from Nevada casinos and therefore knew that they could not be licensed. Because Agosto and the Civellas could not be licensed, they agreed to use code names to "camou-

flage" their true identities and connections with the Tropicana.

Nick Civella instructed Agosto to keep DeLuna informed of his progress in infiltrating the casino. Agosto began to acquire great influence over the daily operations of the hotel and casino. Agosto reported this to DeLuna, who in turn informed the Civellas. Agosto frequently travelled from Las Vegas to Kansas City to meet with DeLuna, Moretina and the Civellas, who occasionally travelled to Las Vegas to discuss Agosto's progress.

At Agosto's request in 1975, Nick Civella was able to rid the Tropicana of competing "hidden" interests. Agosto, DeLuna, and the Civellas then decided to use Carl Thomas to take charge of the skimming at the Tropicana.

Later in 1975, Mitzi Briggs became part-owner of the Tropicana and Agosto's infiltration and exercise of authority ceased temporarily because of Briggs' distrust of Agosto. By 1977, however, Agosto was able to gain Briggs' confidence and by 1978, Agosto was effectively running the hotel and casino. Briggs never knew that any skimming was taking place.

Upon Carl Thomas' recommendation, Agosto hired Shepard as casino manager. Later Agosto hired Caldwell as assistant casino manager. Shepard and Caldwell were to do the actual skimming under Thomas' supervision.

In March 1978, Agosto and Thomas met or spoke with Nick Civella in Los Angeles and Civella ordered them to start skimming. In April 1978, $11,500 was skimmed by Shepard and transported to Kansas City by DeLuna.

In May 1978, Shepard hired Jay Gould as cashier to skim cash from the cashier's cage of the casino and to falsify fill slips to document the "loss" of cash. Signatures and initials of other casino employees were forged by Caldwell. Caldwell supervised Gould, who passed the skimmed money to Shepard. This money was skimmed before the casino owner or the Nevada gaming authorities knew of its existence.

From June through October 1978, Shepard, Caldwell and Gould skimmed over $40,000 a month and gave it to Agosto. Agosto then gave it to Carl Caruso, who transported the money to Kansas City and delivered it to Moretina. Caruso made at least eighteen trips between Las Vegas and Kansas City. Moretina gave Caruso $1,000 after each delivery. The remaining money was distributed to Joseph Aiuppa and Jack Cerone in Chicago. Anthony Chiavola, Sr., the nephew of the Civellas and a Chicago police officer, aided DeLuna and Nick Civella in the distribution of Aiuppa's and Cerone's shares. Moretina acted as DeLuna's assistant in dealing with Agosto and in receiving the skimmed money from Caruso.

By late September 1978, Agosto and the Civellas were concerned that Shepard or his subordinates might be doing "unauthorized" skimming on their own, thereby reducing their profits. At Agosto's suggestion, a "moratorium" on skimming was ordered by Nick Civella in the months of November and December 1978, so that Carl Thomas could do a study of the Tropicana to determine if unauthorized skimming was occurring. In these same months, Agosto sent $50,000 and $60,000 of his own money to the Civellas because they still demanded money. Agosto was later reimbursed for $30,000 of this amount by Shepard with skimmed Tropicana money.

On November 26, 1978, Agosto and Thomas flew to Kansas City to meet with the Civellas and DeLuna to discuss lifting the moratorium and more efficient ways of skimming. Skimming resumed in January 1979 and $80,000 in skimmed money was transported to Kansas City on February 14, 1979. Several defendants' homes were searched on that date by FBI agents pursuant to search warrants. The FBI seized $80,000 from Caruso. Notes (referred to during the trial as a "dairy") and other items were seized from DeLuna and Tamburello.

From approximately June 1978 until March 1979, many telephones and meeting places of the defendants were subject to court-authorized electronic surveillance.

Immediately following the searches, Agosto, the other defendants, Aiuppa, and Cerone engaged in a series of meetings and telephone conversations to assess the damage done by the searches. Evidence about these meetings and telephone conversations obtained by electronic and visual surveillance and from government witness Agosto was introduced at the trial.

*Travel Act Violations*

Appellants argue that the district court erred in refusing to grant their motions for judgment of acquittal on the ground that the government failed to prove an essential element of the conspiracy charged in count one of the indictment and of the substantive Travel Act violations, 18 U.S.C. § 1952. Appellants argue that the government failed to prove any criminal violations of Nevada gaming law. We disagree.

Count one of the indictment charged appellants and others with conspiring in violation of 18 U.S.C. § 371 from about January 1, 1975, to about April 1, 1979, to travel in interstate commerce and to use facilities in interstate commerce

> with the intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of an unlawful activity, namely: the management, operation, conducting, maintaining and carrying on of gaming operations of a licensed gaming establishment in Las Vegas, Nevada, that is, the Tropicana Hotel and Country Club, and the indirect receipt of moneys played therein, by persons who were not licensed or found suitable for licensing by, and whose interests in said gaming establishment had been concealed from, agencies of the State of Nevada, in violation of the Nevada Gaming Control Act, including Sections 463.130, 463.160, 463.-165, 463.170, 463.200, 463.335, 463.339, 463.360 and 463.530 of the Nevada Revised Statutes, and regulations of the Nevada Gaming Commission promulgated thereunder, including Regulations 3.080, 3.100, 3.110, 8.010 and 15.1594-6, and to thereafter perform and attempt to perform acts to promote, manage, establish, carry on and facilitate the promotion, management, establishment, and carrying on of said unlawful activity in violation of Title 18, United States Code, Section 1952.

The indictment also alleged appellants and others conspired to "transport in interstate commerce moneys having a value in excess of $5,000, knowing the same to have been stolen, converted, and taken by fraud, in violation of Title 18, United States Code, Section 2314."

Appellants argue that the government proved only that an unlicensed show producer had assumed de facto control of some operations of the Tropicana Hotel through which he ultimately brought employees into the hotel to steal casino revenues. Appellants argue that theft is a crime in Nevada but not under the Nevada gaming laws. Appellants also argue that the operation or control of a gambling game without a license is not a criminal offense under Nevada law and that such conduct in violation of Nevada gaming regulations only cannot support a Travel Act violation.

■■■ Similar arguments involving the Nevada gaming laws and federal prosecution for violations of the Travel Act were rejected by the Sixth Circuit in a comprehensive opinion in *United States v. Goldfarb*, 643 F.2d 422, 426–32 (6th Cir.), *cert. denied*, 454 U.S. 827, 102 S.Ct. 117, 70 L.Ed.2d 101 (1981). The Travel Act, 18 U.S.C. § 1952, prohibits travel in interstate commerce or the use of facilities of interstate commerce to "promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity," which is further defined as "any business enterprise involving gambling ... in violation of the laws of the State in which they are committed." "[I]t is the violation of federal law which is the gravamen of a Travel Act offense." *United States v. Goldfarb*, 643 F.2d at 426 (citations omitted). As noted in *United States v. Goldfarb*, 643 F.2d at 426, which involved conduct similar to that alleged in the present

case, "[i]t is abundantly clear that as a predicate to a Travel Act conviction, absent a distinct violation of a law of the United States, the defendants must have engaged in some form of unlawful activity prohibited by the law of the State of Nevada."

 We agree with the Sixth Circuit that "a violation of a Nevada Gaming Commission regulation could [not in and of itself] form the predicate state law violation required for a federal prosecution under the Travel Act." *Id.* at 429; *cf. United States v. Gordon,* 464 F.2d 357 (9th Cir. 1972) (violation of nonpenal regulations of state gaming commission insufficient for engaging in "illegal gambling business" in violation of 18 U.S.C. § 1855).. However, according to the government's indictment and the district court's instructions, the unlawful activity under the Travel Act in the present case was not based upon violation of state regulations alone but also upon violation of the related Nevada *statutes. See United States v. Goldfarb,* 643 F.2d at 430.

Appellants also argue that the unlawful activity with which they are accused is not a crime under Nevada state law. The government argues that appellants violated Nevada state law by conducting gambling operations without the necessary licenses, Nev.Rev.Stat. § 463.160(1)(a), and by indirectly receiving gambling moneys without the necessary licenses, *id.* § 463.160(1)(c). Although there is no specific penalty for violation of these provisions, the "catch-all" section, *id.* § 463.360, which makes such a violation a gross misdemeanor, and thus a crime, would apply. *See United States v. Goldfarb,* 643 F.2d at 431; *United States v. Polizzi,* 500 F.2d 856, 873 & n. 17 (9th Cir.1974) ("Once a violation of a state criminal statute has been proved it is irrelevant whether that violation is classified as a felony or misdemeanor."), *cert. denied,* 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975). The cited Nevada statutes are set forth in an appendix.

*Validity of Search Warrant*

Appellants argue that the search of the DeLuna residence authorized by the magistrate was invalid because the magistrate was not a neutral and detached judicial officer who could objectively assess whether probable cause existed. Specifically, appellants argue that the magistrate, while an Assistant United States Attorney from 1961 to 1971, received extrajudicial information about the Civellas and their associates. Appellants argue that during this ten-year period, Carl DeLuna and the Civellas were the subject of an investigation which included electronic surveillance. Further, appellants argue that, during the period the magistrate served as an Assistant United States Attorney, the magistrate (1) was privy to investigative reports which suggested that Carl DeLuna was engaged in anti-social behavior, (2) participated in and supervised the writing and presentation to the court of applications for search warrants relating to Carl DeLuna, (3) presented evidence before the Grand Jury, and (4) prosecuted appellant Carl Civella. Lastly, appellants argue that the magistrate had a long-standing working relationship with the affiant, FBI Agent Ousley, which added to the appearance of impropriety.

 Every magistrate, judge and justice must "disqualify himself [or herself] in any proceeding in which his [or her] impartiality might reasonably be questioned." *Hale v. Firestone Tire & Rubber Co.,* 756 F.2d 1322, 1329–1330 (8th Cir.1985); *see Hall v. SBA,* 695 F.2d 175, 178 (5th Cir.1983); 28 U.S.C. § 455(a). Disqualification is appropriate only if the facts provide what an objective, knowledgeable member of the public would find to be a reasonable basis for doubting the judge's impartiality. *In re United States,* 666 F.2d 690, 695 (1st Cir.1981); *United States v. Poludniak,* 657 F.2d 948, 954 (8th Cir.1981), *cert. denied,* 455 U.S. 940, 102 S.Ct. 1431, 71 L.Ed.2d 650 (1982).

 A magistrate or judge must also disqualify himself or herself if "he [or she] has served in governmental employment and in such capacity participated as counsel ... concerning the proceeding." 28 U.S.C.

§ 455(b)(3). If an indictment or investigation leading directly to the indictment began after a former prosecutor took office as a judge, he or she is not considered to have been "of counsel" and is not required by § 455 to disqualify himself or herself. *Barry v. United States*, 528 F.2d 1094, 1098–99 (7th Cir.), *cert. denied*, 429 U.S. 826, 97 S.Ct. 81, 50 L.Ed.2d 88 (1976).

■ We hold that the magistrate was not required by § 455 to disqualify himself. The magistrate was not government counsel in this case. Appellants do not argue that the investigation which led to the present prosecution was related to the investigation and prosecution handled by the magistrate when he was an Assistant United States Attorney or that the magistrate was still in the United States Attorney's office when the present investigation began. Neither are there facts alleged which would cause a reasonable person, knowledgeable of all the facts, to believe that the magistrate was unable to impartially assess the existence of probable cause. Knowledge of and from prior investigation does not necessarily require recusal.

■ Appellants next argue that the search warrant was a "general warrant" and was invalid because it did not state with specificity the items to be seized. We do not agree.

> Where the precise identity of goods cannot be ascertained at the time the warrant is issued, naming only the generic class of items will suffice because less particularity can be reasonably expected than for goods (such as those stolen) whose exact identity is already known at the time of issuance.

*United States v. Johnson*, 541 F.2d 1311, 1314 (8th Cir.1976) (citations omitted). *See also Andresen v. Maryland*, 427 U.S. 463, 475–82, 96 S.Ct. 2737, 2745–49, 49 L.Ed.2d 627 (1976). This lack of specificity is often encountered and has been expressly approved. *United States v. Coppage*, 635 F.2d 683, 687 (8th Cir.1980); *United States v. Williams*, 633 F.2d 742, 745 n. 5 (8th Cir.1980); *United States v. Dennis*, 625 F.2d 782, 792 (8th Cir.1980); *In re Search Warrant Dated July 4, 1977*, 572 F.2d 321, 328 n. 4 (D.C.Cir.1977), *cert. denied*, 435 U.S. 925, 98 S.Ct. 1491, 55 L.Ed.2d 519 (1978). The pertinent part of the warrant in the present case authorized seizure of certain generic classes of items and "other means of transferring, distributing and concealing casino proceeds" in violation of the named statutes. The description of the items to be seized by generic classes was reasonably specific under the circumstances of the present case.

The government argues that appellants Civella, Moretina, and Chiavola lacked standing to object to the validity of the search warrant and the seizure of items pursuant to the search warrant. We need not decide this issue because DeLuna had standing to challenge the search of his house.

*Admissibility of Writings Seized from Co-conspirators*

Thomas argues that the notes or writings seized pursuant to a search warrant from the homes of DeLuna and Tamburello were improperly admitted under the co-conspirator statement exception to the hearsay rules. Thomas argues that the independent evidence presented by the government was insufficient to prove that the statements were made "in furtherance of" the charged conspiracy.

■ A statement, including a writing, is not hearsay under Fed.R.Evid. 801(d)(2)(E) if it is "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." In *United States v. Bell*, 573 F.2d 1040, 1044 (8th Cir.1978), this court stated that before an out-of-court declaration of a co-conspirator may be admitted against a defendant, the government must prove that (1) a conspiracy existed, (2) the defendant and the declarant were members of the conspiracy, and (3) the statements were made during the course and in furtherance of the conspiracy. The district court determines the admissibility of the co-conspirator's statement under Fed.R.Evid. 801(d)(2)(E) and must be satisfied that "it is more likely

than not that the statement was made during the course and in furtherance of an illegal association to which the declarant and the defendant were parties." *DeMier v. United States*, 616 F.2d 366, 371 (8th Cir.1980), *citing United States v. Bell*, 573 F.2d at 1044. In order to be made in furtherance of the conspiracy, a statement "must somehow advance the objectives of the conspiracy, not merely inform the listener [or reader] of the declarant's activities." *United States v. Snider*, 720 F.2d 985, 992 (8th Cir.1983) (citations omitted), *cert. denied*, ___ U.S. ___, 104 S.Ct. 1613, 80 L.Ed.2d 142 (1984).

In the present case the district court conditionally admitted several cryptic writings containing code names, telephone numbers, and references to disbursements of moneys. At the close of the government's evidence, the district court made an explicit finding in the record, as required by *United States v. Bell*, that the government proved by independent evidence that the proffered writings were more likely than not made during the course and in furtherance of a conspiracy of which Thomas and other appellants were members.

In *United States v. Singer*, 732 F.2d 631, 636 (8th Cir.1984) (citations omitted), this court, in discussing the admissibility of the co-conspirator's statements, stated that although "the evidence must be independent, *i.e.* exclusive of the challenged statements, ... it may be circumstantial.... The district court's determination will not be reversed unless [it is] clearly erroneous." Therefore, we must decide whether the district court's conclusion that the challenged co-conspirator's statements were made in furtherance of the conspiracy was clearly erroneous.

Agosto testified at length concerning Thomas' involvement in the casino skimming conspiracy. Agosto explained that the handwritten cryptic notes referred to activities between DeLuna and Carl Thomas, such as meetings, telephone conversations, and disbursements of funds made in connection with the skimming operations. The district court concluded that the notes

were part of the records made on the skimming operation and held that these records were made in furtherance of the conspiracy. *See, e.g., United States v. Shursen*, 649 F.2d 1250, 1256 (8th Cir.1981) (*Shursen*). In *Shursen*, we held that ledgers containing cryptic notes of wagering transactions relating to a gambling operation were made in furtherance of the conspiracy because such records were necessary to a gambling operation. *Id.* at 1256. We hold that the district court's conclusion was not clearly erroneous.

Thomas also argues that some of the notes referring to disbursements of moneys have legitimate explanations, *i.e.*, that the notes indicated repayments on loans and therefore were inadmissible because they were not made during the course and in furtherance of the charged conspiracy. However, after careful examination of the voluminous record before this court, we hold that the district court's finding that these notes were made during the course and in furtherance of a conspiracy to which Thomas belonged is not clearly erroneous.

*Confrontation Rights*

Appellants argue that even if properly admitted as co-conspirators' statements pursuant to Fed.R.Evid. 801(d)(2)(E), the admission of notes seized from the homes of DeLuna and Tamburello and certain tape recordings violated their rights under the confrontation clause of the sixth amendment. The circuits are divided as to whether a co-conspirator statement that is admissible under Fed.R.Evid. 801(d)(2)(E) necessarily satisfies the requirements imposed by the confrontation clause. This circuit, following the Supreme Court decision in *Ohio v. Roberts*, 448 U.S. 56, 65–66, 100 S.Ct. 2531, 2538–39, 65 L.Ed.2d 597 (1980), has held that even if a co-conspirator statement is admissible under Fed.R. Evid. 801(d)(2)(E), in order to satisfy the requirements of the confrontation clause, the government must demonstrate that the declarant is unavailable and that the statement bears sufficient indicia of reliability. *See United States v. Massa*, 740 F.2d 629, 638–39 (8th Cir.1984). *Accord United*

*States v. Ammar,* 714 F.2d 238, 254–57 (3d Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983); *United States v. Perez,* 658 F.2d 654, 660–61 & n. 5 (9th Cir.1981); *United States v. Wright,* 588 F.2d 31, 37–38 (2d Cir.1978), *cert. denied,* 440 U.S. 917, 99 S.Ct. 1236, 59 L.Ed.2d 467 (1979). Several circuits have adopted "a per se rule permitting the use of properly admissible extrajudicial statements of a co-conspirator who does not take the stand at trial without risk of reversal for violation of his co-defendants' rights to confrontation." *United States v. Papia,* 560 F.2d 827, 836 n. 3 (7th Cir.1977); *accord United States v. Lurz,* 666 F.2d 69, 80–81 (4th Cir.1981), *cert. denied,* 455 U.S. 1005, 102 S.Ct. 1642, 71 L.Ed.2d 874 (1982); *United States v. McManus,* 560 F.2d 747, 750 (6th Cir.1977), *cert. denied,* 434 U.S. 1047, 98 S.Ct. 894, 54 L.Ed.2d 798 (1978); *Ottomano v. United States,* 468 F.2d 269, 273 (1st Cir.1972), *cert. denied,* 409 U.S. 1128, 93 S.Ct. 948, 35 L.Ed.2d 260 (1973).

The declarants who were also co-defendants in the present case are considered "unavailable" for the purposes of the confrontation clause because they exercised their fifth amendment right and chose not to testify at their trial. We only need to consider, therefore, the "indicia of reliability" of the statements made by the co-defendants. *See United States v. Ammar,* 714 F.2d at 255.

██ As noted above, this court has already rejected the government's argument that the co-conspirator's exception is a "firmly rooted hearsay exception" and that reliability can be presumed under *Ohio v. Roberts. See United States v. Massa,* 740 F.2d at 639. *See also United States v. Ammar,* 714 F.2d at 255.[2] This court, however, has stated that although "the

confrontation clause and the hearsay exceptions are not co-extensive, ... evidence properly admitted under the co-conspirator exception does not, absent unusual circumstances, violate the confrontation clause." *United States v. Panas,* 738 F.2d 278, 283–84 (8th Cir.1984) (citations omitted). *See also United States v. Bentley,* 706 F.2d 1498, 1507 n. 7 (8th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2397, 81 L.Ed.2d 354 (1984); *United States v. Kiefer,* 694 F.2d 1109, 1113 (8th Cir.1982); *United States v. Singer,* 660 F.2d 1295, 1307 (8th Cir.1981), *cert. denied,* 454 U.S. 1156, 102 S.Ct. 1030, 71 L.Ed.2d 314 (1982); *United States v. Nelson,* 603 F.2d 42, 46 (8th Cir. 1979). *Accord United States v. Ammar,* 714 F.2d at 256. The following factors are relevant to the reliability inquiry under the confrontation clause: (1) whether the context of the statements and the persons to whom they were made suggest that the statements are reliable, (2) whether the declarant had a motive for lying, (3) whether the declarant had difficulty with his or her memory, and (4) whether the declarant had personal knowledge of the identity and role of the participants in the crime. *See United States v. Massa,* 740 F.2d at 639; *United States v. Kiefer,* 694 F.2d at 1113. It is not necessary that all four factors be present in order to satisfy the confrontation clause. *United States v. Ammar,* 714 F.2d at 256.

██ After careful review of the record we are convinced that the out-of-court statements by DeLuna and Tamburello contain sufficient "indicia of reliability." Certainly DeLuna and Tamburello had personal knowledge of the identity and the roles of the conspiracy members. The statements were not made under circumstances that suggest an incentive for prevarication.[3] Finally, the statements were corrob-

---

2. As noted by this court in *United States v. Massa,* 740 F.2d 629, 639 (8th Cir.1984), *citing United States v. Ammar,* 714 F.2d 238, 255 (3d Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983),

 [t]he Federal Rules of Evidence categorize coconspirator statements along with admissions as "[s]tatements which are not hearsay." Fed.R.Evid. 801(d)(2). Admissions are not

admitted because of confidence in their inherent reliability; rather, they are admitted because a party will not be heard to object that [she or he] is unworthy of credence.

3. In *United States v. Ammar,* 714 F.2d at 257 n. 16, the court noted that

 [v]irtually all of the statements ... admitted under Rule 801(d)(2)(E) were made to other

orated by independent evidence. *Id.* at 256–57.

Although we caution district courts to carefully monitor the admission of co-conspirator statements in complex conspiracy trials such as the one in the present case, we hold that the co-conspirator's statements did not violate the confrontation clause.

### Agosto's Testimony

■ Thomas argues that the district court abused its discretion under Fed.R. Evid. 611(a) in permitting the government to present Agosto's testimony in such a way that Thomas argues restricted defense counsel's ability to effectively cross-examine Agosto. The government argues that the orderly presentation of evidence approved by the district court aided the jury's understanding of a complex case and at the same time protected all appellants' confrontation rights. The government argues, therefore, that the district court did not abuse its discretion in approving the presentation of Agosto's testimony. We agree.

During the government's case-in-chief, Agosto took the stand on three separate occasions (June 8–10, June 14–16, and June 20–21). During each Agosto "installment," the government introduced as evidence many tape-recorded conversations and handwritten notes concerning the conspiracy, and Agosto testified about this evidence immediately after its presentation. Upon completion of each installment, defense counsel was permitted to thoroughly cross-examine Agosto, using the notes and tape recordings presented on direct, as well as the transcripts of the tape recordings to aid the cross-examination.[4] Defense coun-

sel, however, wished to cross-examine Agosto immediately after his commentary upon each of the 106 tape recordings, not following each installment. To demonstrate the necessity of such frequent cross-examination, defense counsel presented to the district court an affidavit by a psychologist attesting to the adverse psychological impact upon the jury of the procedure requested by the government.

The district court was unpersuaded by the psychologist's affidavit. Relying on *United States v. Jackson*, 549 F.2d 517 (8th Cir.), *cert. denied*, 430 U.S. 985, 97 S.Ct. 1682, 52 L.Ed.2d 379 (1977), and Fed. R.Evid. 611(a), the district court allowed the government to present Agosto's testimony in installments, permitting cross-examination of Agosto by defense counsel only at the completion of each installment. To protect appellants' rights of confrontation, the district court instructed the government to interrogate Agosto as any other witness, that Agosto would not be permitted to testify in a narrative fashion. The district court also warned the government that each installment of Agosto's testimony must relate to a new subject, to a new sequence of events. The district court stated that Agosto could not clarify previous testimony in subsequent installments. Thomas argues that despite these safeguards the manner in which Agosto's testimony was presented rendered Agosto effectively impervious to cross-examination.

■ In this circuit the manner and order of interrogation and presentation of evidence are matters committed to the discretion of the district court. *See United States v. Jackson*, 549 F.2d at 528. The method of presenting Agosto's testimony

members of the conspiracy. In view of the importance of maintaining trust between conspirators, and the possibility that whatever was said by one might be relied upon by the others, the conspirators would have understood that a falsehood could have destroyed the enterprise in which they were jointly engaged. Moreover, many of the statements were made under circumstances which indicate spontaneity, decreasing the likelihood of deliberate falsehood.

The statements in the present case were made under similar circumstances.

4. Each installment of Agosto's testimony was followed by supplemental testimony of witnesses providing background and foundational evidence. Corroborating Agosto's testimony, FBI agents testified about their surveillance of the skimming operations. Thomas does not dispute that each corroborative witness was subjected to thorough cross-examination by defense counsel immediately following his or her testimony.

permitted by the district court in the present case provided Thomas ample opportunity to thoroughly cross-examine Agosto regarding his testimony. The district court concluded that with the proper safeguards the orderly presentation requested by the government did not diminish Thomas' or other appellants' right to effective cross-examination. We hold that the district court did not abuse its discretion in permitting the government to present Agosto's testimony in installments.

*Expert Testimony*

Thomas and Civella argue that the district court abused its discretion in excluding the testimony of a linguistics expert that Thomas and Civella argue was vital to their theory of defense. Thomas and Civella sought to introduce the testimony of an expert in the field of applied linguistics to testify concerning the results of a "discourse analysis" the expert performed on the Marlo tape. Discourse analysis focuses on the structure of a conversation in order to determine which speakers have "conversational power" or the ability to control the conversation. Appellants hoped to demonstrate that their participation in the Marlo tape conversation focused on their legitimate financial interests and the other participants emphasized the illegal activities.

■ Fed.R.Evid. 702 states that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert ... may testify thereto in the form of an opinion or otherwise." The district court has broad discretion in deciding whether to admit expert testimony. *See Holmgren v. Massey-Ferguson, Inc.*, 516 F.2d 856, 858 (8th Cir.1975). In *United States v. Schmidt*, 711 F.2d 595, 598–99 (5th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 705, 79 L.Ed.2d 169 (1984) (*Schmidt*), the court upheld the district court's decision to exclude the testimony of a linguistics expert. In *Schmidt*, the defense, through expert testimony, sought to explain how certain statements, that on

their face might be construed to be false, might be viewed differently when considered in the context of the entire discussion. The Fifth Circuit concluded, however, that the district court was in the best position to determine whether the proffered expert testimony would assist or confuse the jury and held that the district court did not abuse its discretion in refusing to admit the expert testimony. *Id.*

■ In the present case the district court considered the arguments of counsel on this issue and, outside the presence of the jury, permitted the expert to explain the nature of his proposed testimony. The district court excluded the proffered expert testimony on the ground that it would confuse the jurors rather than assist them to understand the evidence or to determine a fact in issue. We hold that the district court did not abuse its discretion in excluding the proffered expert testimony.

*Evidence of "Other Crimes" and "Bad Acts"*

Appellants argue that the district court erred in admitting evidence of "other crimes" and acts tending to show bad character because the evidence was irrelevant or its probative value was outweighed by its prejudicial impact and therefore should have been excluded under Fed.R.Evid. 404(b).

■ Fed.R.Evid. 404(b) states that evidence of "other crimes, wrongs, or acts" is not admissible to prove character, but is admissible "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Rule 404(b) is one of inclusion rather than exclusion and "admits evidence of other crimes or acts relevant to any issue in the trial, unless it tends to prove only criminal disposition." *United States v. Wagoner*, 713 F.2d 1371, 1375 (8th Cir.1983). Evidence of prior wrongful acts is admissible if (1) the evidence is relevant to an issue other than the defendant's character, (2) there is clear and convincing evidence that the defendant

committed the other acts, and (3) the potential unfair prejudice does not outweigh its probative value. *Id., citing United States v. Evans,* 697 F.2d 240, 247–48 (8th Cir.), *cert. denied,* 460 U.S. 1086, 103 S.Ct. 1779, 76 L.Ed.2d 352 (1983).

Evidence which is probative of the crime charged, and not solely uncharged crimes, is not "other crimes" evidence. *United States v. Bagaric,* 706 F.2d 42, 68 (2d Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 134, 78 L.Ed.2d 128 (1983); *United States v. Black,* 692 F.2d 314, 316 (4th Cir.1982). Further, where the evidence of an act and the evidence of the crime charged are inextricably intertwined, the act is not extrinsic and Rule 404(b) is not implicated. *United States v. Caspers,* 736 F.2d 1246 (8th Cir.1984); *United States v. Derring,* 592 F.2d 1003, 1007 (8th Cir.1979).

The trial court has broad discretion under this rule, *United States v. Evans,* 697 F.2d at 248, and will be reversed only when the evidence "clearly has no bearing upon any of the issues involved." *United States v. Wagoner,* 713 F.2d at 1375. In balancing the prejudicial effect and probative value, great deference is given to the district judge's determination, *United States v. Boykin,* 679 F.2d 1240, 1244 (8th Cir.1982), and express findings are not required. *United States v. Koessel,* 706 F.2d 271, 275 n. 4 (8th Cir. 1983); *United States v. Evans,* 697 F.2d at 248–49. We examine appellants' objections to the admission of evidence of "other crimes" and wrongful acts in light of these general principles.

### Tropicana and El Dorado Merger

The government presented evidence that Agosto and Tropicana executives hoped to merge with another public corporation, the El Dorado Corporation, which sold recreational vehicles. The goal of the merger was to pump new life into the Tropicana, which had suffered many financial setbacks. Agosto testified that he had "insider information" that the stock was to be offered to the public and feared the Securities and Exchange Commission

might launch an investigation of him, the Tropicana, and the merger if Agosto and his associates made large profits on the stock venture.

The government argues that the evidence about the proposed merger did not constitute evidence of other crimes or wrongful acts. The government further argues that the evidence was relevant to its case because it showed Agosto's control of the Tropicana, DeLuna's supervision of Agosto, and DeLuna and the Civellas' intent to exercise control over the Tropicana and their involvement in the management decisions of the Tropicana.

We hold that the district court did not abuse its discretion in admitting evidence of the proposed merger. The evidence was offered to prove that appellants had a hidden interest in the Tropicana and exercised control over decisions concerning the Tropicana. This evidence, therefore, is probative of the crime charged and is not evidence of other crimes or wrongful acts. *United States v. Black,* 692 F.2d at 316.

### Chicago Conspiracy (Argent Corporation)

The Argent Corporation, which owned four casinos, was allegedly the focus of a conspiracy to skim money from casinos and to transport the money in interstate commerce. This conspiracy is the subject of another indictment (*United States v. DeLuna,* No. 83–124–01–CRW8 (W.D.Mo.); *United States v. DeLuna,* 759 F.2d 659 (8th Cir.1985) (interlocutory appeal from order denying motion to dismiss indictment)); there is a partial overlap in time and membership in the Chicago conspiracy and the conspiracy charged in this case.

The government presented evidence that the Tropicana, although financially unsound, was able to secure loans from several other casinos, several of which belonged to the Argent Corporation. Agosto testified that the Tropicana was able to secure the loans because of the Civellas' influence.

Appellants argue that the Chicago conspiracy is distinct from the charged conspiracy in participants, aims, and conduct.

Appellants therefore argue that references to control by Chicago, the Argent Corporation, and Agosto's efforts to acquire the LIDO show at the Stardust (owned by the Argent Corporation) were part of a second conspiracy, and the unfair prejudice to appellants from the evidence outweighed any slight probative value.

The government argues that the references to the Argent Corporation and persons associated with Chicago did not constitute evidence of "other crimes" because the loans and the influence exercised to get them were not alleged or shown to be illegal. The government also argues that the evidence was relevant to show Agosto's control over the Tropicana and to establish that Civella directed Agosto to certain places to obtain loans and used his influence to insure that the loans were made. The government argues that other evidence concerning Chicago (Agosto's testimony that skimmed money was going to Chicago and that a meeting was to be held in Chicago in October 1978, certain notes of DeLuna that document the transfer of Tropicana funds to persons in Chicago) is evidence of the charged conspiracy and not other crimes evidence.

We agree that this evidence is not "other crimes" evidence. The district court did not abuse its discretion in admitting this evidence which was probative of issues in the case.

### Rosenthal Gaming Activities

Frank Rosenthal, a non-licensed sports entertainer at the Stardust casino, was involved in an alleged conspiracy which involved accusations by Rosenthal against the governor of Nevada and which was reported in Las Vegas newspapers as an attempt to intimidate the governor during his election campaign.

The government introduced testimony of Agosto, newspaper articles about the Rosenthal accusations which were seized from DeLuna's and Carl Civella's homes, and recorded conversations concerning the activities of Rosenthal. Agosto testified that he feared that his status as a non-licensed entertainer (as producer of the floor show)

at the Tropicana would be jeopardized if Rosenthal, who occupied a similar position at the Stardust, continued his controversial activities and was subsequently investigated because of these activities. Recorded conversations of appellants discussing this concern were also admitted into evidence.

The government argues that the evidence was offered to establish the interest and involvement of DeLuna and the Civellas in the gaming industry in Las Vegas and their interest in maintaining their de facto control of the Tropicana through Agosto.

We hold that the district court did not abuse its discretion in admitting this evidence. The evidence concerning Rosenthal was not "other crimes" evidence because Rosenthal was not a defendant, the government did not allege and the evidence did not indicate that appellants were involved with Rosenthal or that appellants committed any crimes or wrongful acts. Further, the district court instructed the jury that "these matters ... do not necessarily in any respect relate to anything illegal. And they are submitted solely for the purpose of showing the contact between the parties with respect to these articles and an interest in them by ... parties."

### "Bakers" Conspiracy

The government presented evidence that a group of individuals from New Jersey identified as the "Bakers" held an undisclosed hidden interest in the Tropicana prior to Agosto's gaining control. The Bakers reasserted an interest in the Tropicana in 1978. Agosto testified that he met with Nick Civella in a light projection room of the Tropicana to discuss this interest. Following instructions from Chicago and the Civellas, Agosto paid the Bakers $375,000 of his own money in order to buy out this interest. Agosto testified that this was in keeping with the agreements with the Civellas that the Civellas would eliminate the Bakers as rivals to Agosto's control of the Tropicana and would protect Agosto from other people who might attempt to assert interests at the Tropicana.

The government argues that the evidence does not indicate criminal activity by any appellant. The government further argues that the evidence is highly probative of the conspiracy charged, that is, that appellants had a hidden interest in the Tropicana and exercised management and control over the Tropicana. We agree with the government's position and hold that the district court did not abuse its discretion in admitting the evidence.

### Misconduct of Carl Thomas

The government was permitted to present recorded conversations of Carl Thomas (Marlo tape, Ex. 199), wherein he stated that he had been involved in skimming at many casinos in Las Vegas for many years. This conversation occurred during a meeting wherein appellants discussed various methods of skimming and Thomas related his experience with skimming and recommended ways of skimming.

Appellants argue that the evidence was highly prejudicial and should have been excluded under Fed.R.Evid. 404(b). The government argues that the evidence was not other crimes evidence because the references were inextricably intertwined in the offense charged and because the evidence established Thomas' role in the conspiracy. Alternately, the government argues that the evidence is admissible under Fed.R.Evid. 404 as proof of intent.

We hold that the evidence was admissible. "The rule limiting admissibility of uncharged misconduct does not shield an accused from the reception of evidence that he boasted of his past experience in crime in order to reassure a prospective vender or co-worker of his skill and reliability." *United States v. Stokes*, 12 M.J. 229, 10 Mil.L.Rep. (Pub.L.Educ.Inst.) 2185, 2190 (C.M.A.1982). Moreover, Thomas' statements, to the extent they prove bad character and Rule 404(b) is implicated, are admissible to prove Thomas' intent to engage in the charged conspiracy because Thomas had consistently taken the position that he had no intent to join a conspiracy.

### List of Excluded Persons (Black Book)

The government was permitted to introduce evidence that Carl and Nick Civella appeared in the List of Excluded Persons (commonly referred to as the Black Book). The Black Book is a list of people who must be excluded from Nevada casinos by a gaming licensee. The Black Book is issued by the State Gaming Control Board and adopted and promulgated by the Nevada Gaming Commission. A gaming licensee is subject to disciplinary action if the licensee fails to evict a person listed in the Black Book. A government witness testified that persons listed in the book could not be licensed.

Appellants argue that the names of Carl and Nick Civella were entered in the Black Book when there were no regulations concerning who was to be included and the Civellas were given no notification or opportunity to defend against inclusion. Appellants argue that this evidence, strongly suggesting bad character, was prejudicial and should have been excluded.

The government argues that the evidence was offered to show that the Civellas, because they were in the book, could not be licensed. Alternately, the government argues that the evidence would be admissible, even if considered "other crimes" evidence, because it established the motives of appellants. The government further argues that this evidence was necessary because appellants refused to stipulate that they were "unlicensable." We hold that the district court did not abuse its discretion in admitting this evidence.

### Prison Records of Civella and Quinn Testimony

The government was permitted to present the testimony of James Patrick Quinn (Nick Civella's attorney of many years), prison visitation records and other evidence which indicated that Nick Civella had been in prison and had been involved in a number of prior criminal proceedings. Appellants argue that this evidence had no purpose other than to show that Nick Civella had a propensity to commit crimes and to

raise an inference of guilt by association as to the other defendants.

The government argues that the evidence was admitted as necessary background or to establish the identity of the persons referred to by code names in De-Luna's notes and the recorded conversations. The principal method of establishing the identity of these persons was a comparison of prison records reflecting visitors of Nick Civella with DeLuna's notes of the same date. Other evidence (*e.g.*, prison hospital records, telephone records) was also used in conjunction with DeLuna's notes to establish the identities of persons referred to by code names, meeting places, participants in meetings, and recipients of "skimmed" money. The government argues that Quinn's testimony was offered to establish that DeLuna, Tamburello, and the Civellas used Quinn's office for the purposes of the conspiracy.

■ We hold that the district court did not abuse its discretion in admitting the prison visitation records of Nick Civella. The evidence was not other crimes evidence because the government introduced the evidence to prove the crime charged—that appellants, referred to by code names, were involved in the conspiracy and committed certain substantive offenses as part of the conspiracy. The identification of appellants' code names was critical to the government's case. DeLuna's notes and the tape recorded conversations corroborate Agosto's testimony only if the code names and appellants could be matched. Even if we consider the prison records as other crimes evidence, it would still be admissible to establish identity under Rule 404(b) and the probative value of the evidence outweighs the prejudice resulting from the evidence of a prior conviction.

■ The district court did not abuse its discretion in admitting Quinn's testimony concerning appellants' use of Quinn's office for personal use (meetings, phone calls, receipt of mail). The evidence was not other crimes evidence because there was no allegation that this conduct was wrong or criminal. Quinn in response to several questions did testify that he had represented Nick Civella in a number of criminal proceedings and his answers indirectly indicated that Civella had been convicted. The district court, however, sustained Chiavola's objection to further questions concerning convictions of Nick Civella.

■ Appellants also argue that Dr. Skinner's testimony concerning Civella's status as a prisoner and the security surrounding Civella while at the UCLA Medical Center—guards and chains—was erroneously admitted. We agree that this is evidence of "other crimes" and does not come within any of the exceptions of Rule 404(b). We hold, however, that this evidence was harmless because evidence of Civella's prison record was properly admitted as part of the government's evidence concerning the identity of the code names. Consequently the erroneous admission of Dr. Skinner's testimony concerning Civella's status as a prisoner could have had no effect on the outcome of the trial.

### Defense Counsel Conduct

■ Appellants argue that they suffered irreparable damage and prejudice as a result of Agosto's testimony concerning alleged acts of impropriety by DeLuna's defense attorney. Appellants argue that Agosto was "vituperative" and "hurled personal barbs" at the defense attorney. Agosto during cross-examination by defense counsel charged that a former partner of the defense attorney, who had represented Agosto prior to this trial, had requested Agosto to lie under oath during a hearing before the Nevada Gaming Control Board.

The government argues that this evidence was not other crimes evidence because the evidence did not concern any crimes or misconduct by appellants. The government further argues that the wrongdoing also was not attributed to DeLuna's defense attorney, but rather to a former partner of the defense attorney who did not represent any of the defendants at trial.

We hold that the district court did not err in denying a severance or a mistrial based on the brief exchanges between Agosto and DeLuna's defense attorney. The evidence was not other crimes evidence and therefore Rule 404(b) is not implicated.

**Evidence of Post-Conspiracy Meetings**

■ Appellants argue that the district court erred in admitting testimony of surveillance agents of a meeting on March 11, 1979, of Carl Civella, DeLuna, Chiavola, Aiuppa, and Cerone at the Chicago residence of Anthony Chiavola. Appellants argue that the charged conspiracy ended on February 14, 1979 (the date appellants' homes were searched) and the meeting was evidence of another conspiracy. The government argues that the meeting occurred during the period encompassed by the charged conspiracy. Further, the indictment alleged that the conspiracy continued until on or about April 1, 1979. The district court held that the evidence of the March 11, 1979, meeting was reasonably probative of the conspiracy charged because "it is a gathering in the context of months and weeks of a close association, [from] which ... the jury could reasonably infer the conspiracy to commit wrongful acts." We agree with the district court's analysis and hold that the district court did not abuse its discretion in admitting the evidence.

■ Appellants also argue that the district court erred in admitting a recorded conversation between the Civellas and Chiavola on November 30, 1979, at the United States Prison at Leavenworth (Ex. 237b) because the recorded statements were not made in furtherance of the charged conspiracy, which ended at least nine months before. The government argues that the tape recorded conversation was not offered as a co-conspirator statement but was offered only against Carl Civella and Chiavola to prove their consciousness of guilt because during the November 1979 conversation they discussed the two meetings held at Chiavola's house and other acts in furtherance of the conspiracy. The district court did not abuse its discretion in admitting the recorded conversation of November 30, 1979. Although the conversation was not made during the course and in furtherance of the charged conspiracy, the statements were admissible as admissions of a party-opponent. Fed.R. Evid. 801(d)(2)(A); *e.g., United States v. Kenny,* 645 F.2d 1323, 1339–40 (9th Cir.), *cert. denied,* 452 U.S. 920, 101 S.Ct. 3059, 69 L.Ed.2d 425 (1981); *United States v. Porter,* 544 F.2d 936, 939 (8th Cir.1976). The district court instructed the jury that the statements could only be considered against Chiavola and Civella.

We have carefully considered the remaining evidentiary issues raised by appellants and find them to be without merit.

*Pinkerton Instruction*

■ Appellants next argue that the district court erred in giving the jury Instruction No. 68, a "Pinkerton" instruction.[5] *See Pinkerton v. United States,* 328 U.S. 640, 645–48, 66 S.Ct. 1180, 1183–84, 90

---

**5.** Instruction No. 68 instructed the jury as follows:

If you find that a particular defendant is guilty of conspiracy as charged in Count One, you may also find that defendant guilty of an offense or offenses as charged in any one or more of Counts Two through Fifteen of the indictment in which he is charged, provided that you find that the essential elements of that Count as defined in these instructions have been established beyond a reasonable doubt, and provided that you also find beyond a reasonable doubt,

First, that the offense or offenses defined in the non-conspiracy Counts Two through Fifteen was or were committed pursuant to or in the scope of the conspiracy, and

Second, that the particular defendant was a member of the conspiracy at the time that the offense or offenses charged in Counts Two through Fifteen was or were committed.

Under the conditions just defined a defendant who is found guilty of conspiracy may also be found guilty of the offense charged in another count or counts even though he did not participate in the acts constituting the offense as defined in the other count or counts. The reason for this is that a co-conspirator committing an offense pursuant to a conspiracy is held to be the agent of other conspirators.

L.Ed. 1489 (1946). Appellants argue that a Pinkerton instruction unconstitutionally creates a mandatory presumption which shifts the burden of persuasion of every element of the offenses charged from the government to the defendant. *See, e.g., Sandstrom v. Montana,* 442 U.S. 510, 523–24, 99 S.Ct. 2450, 2458–59, 61 L.Ed.2d 39 (1979); *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975).

Appellants' argument is without merit. The district court did not err in giving a Pinkerton instruction to the jury. *E.g., United States v. Redwine,* 715 F.2d 315, 322 (7th Cir.1983), *cert. denied,* — U.S. ——, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1984); *United States v. Richmond,* 700 F.2d 1183, 1191 (8th Cir.1983). The instruction challenged in the present case correctly reflected the substance of the holding in the *Pinkerton* case that a defendant found guilty of a conspiracy may also be found guilty of substantive offenses committed by a co-conspirator or co-conspirators, in furtherance of the conspiracy, at the time that defendant was a member of the conspiracy, even though that defendant did not participate in the substantive offenses or have any knowledge of them. 328 U.S. at 645–48, 66 S.Ct. at 1183–84. The challenged instruction did not create any unconstitutional presumptions and did not modify the government's burden to prove every element of the offenses charged beyond a reasonable doubt.

*Variance*

Appellants argue that reversal of their convictions is required because there was a variance between the indictment and the evidence which resulted in an amendment of the indictment and which affected their "substantial rights." Specifically, appellants argue that the evidence showed that multiple conspiracies existed although the indictment alleged only one conspiracy. Appellants further argue that the admission of irrelevant and inflammatory evidence concerning these other conspiracies confused the jury and resulted in substan-

tial prejudice to them. Lastly, appellants argue that the district court erred in failing to give a cautionary instruction.

 The government argues that the evidence did not establish multiple conspiracies. The government further argues that any evidence of other conspiracies was admissible to prove the charged conspiracy.[6]

Variance refers to the failure of the government's proofs to conform to the indictment. A variance is not fatal to the prosecution unless the defendant could not reasonably have anticipated from the indictment what evidence would be presented at trial or unless the indictment is so vague as not to bar subsequent prosecution on the same offense. *United States v. Goldfarb,* 643 F.2d at 433 (citing district court order denying post trial motions). To resolve the question of whether the government's proof showed that one or multiple conspiracies existed, we must determine "whether there was 'one overall agreement' to perform various functions to achieve the objectives of the conspiracy." *United States v. Jackson,* 696 F.2d 578, 582 (8th Cir.1982) (citations omitted), *cert. denied,* 460 U.S. 1073, 103 S.Ct. 1531, 75 L.Ed.2d 952 (1983). The existence of a single agreement can be inferred if the evidence revealed that the alleged participants shared "a common aim or purpose" and "mutual dependence and assistance" existed. *Id.* at 582–83, *citing United States v. Bertolotti,* 529 F.2d 149, 154 (2d Cir.1975); *see Hayes v. United States,* 329 F.2d 209, 213–14 (8th Cir.), *cert. denied,* 377 U.S. 980, 84 S.Ct. 1883, 12 L.Ed.2d 748 (1964).

 We hold that there was no variance between the indictment and the evidence. The government offered the testimony of Agosto, various tape recorded conversations (notably the Marlo tape of November 26, 1978), and DeLuna's notes to establish that appellants (and other defendants) had a common aid or purpose—the

---

**6.** Appellants cite as error admission of evidence of these conspiracies on other grounds. These

alleged errors are discussed in other parts of this opinion.

skimming of money from the Tropicana and transportation of this money to persons in other states who had a hidden interest in the Tropicana. The evidence also showed "dependence and assistance" among the co-conspirators. Agosto needed the Civellas' assistance to gain control of the Tropicana, keep out other hidden interests at the Tropicana, and maintain his cash flow at the Tropicana. The Civellas needed Agosto as their agent at the Tropicana to convey information to them, implement decisions and oversee the skimming operation. DeLuna and Moretina were needed to distribute the money to the co-conspirators. Chiavola was involved in distributing money to two individuals (Aiuppa and Cerone) in Chicago and in providing a meeting place and security for the co-conspirators. Thomas, Caldwell and Shepard, under the direction of the other co-conspirators, did the actual skimming at the Tropicana.

*Severance*

Appellants next argue that the district court abused its discretion in denying their motions for severance. All appellants argue that they were prejudiced by the "spillover effect" of the incriminating evidence presented at the joint trial. Appellants also note that government witness Agosto repeatedly made sarcastic and prejudicial references to lead defense counsel and counsel's professional relationship with other persons who had been charged with similar unlawful conduct. Thomas also argues that he was prejudiced because his co-defendants had reputations as notorious gangsters and because government witness Agosto made several statements which referred to his co-defendants' reputations for violence and revenge and Agosto's fear for his life because of his cooperation with the government.

Thomas argues individually that he was also prejudiced because his co-defendant Carl Civella would have testified in Thomas' favor in a separate trial and because his defense was so inconsistent with and antagonistic to that of his co-defendants.

For the reasons discussed below, we hold that the district court did not abuse its discretion in refusing to grant appellants' motions for severance.

As a preliminary matter we reject appellants' general allegation of misjoinder. There is a strong policy in favor of joint trial where the defendants are "alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Fed.R.Crim.P. 8(b). However, severance of charges or defendants properly joined is governed by Fed.R.Crim.P. 14. As noted in *United States v. Jackson,* 549 F.2d at 523 (citations omitted).

[i]t is the general rule that persons charged in a conspiracy should be tried together, particularly where proof of the charges against the defendants is based upon the same evidence and acts. Severance will be allowed upon a showing of real prejudice to an individual defendant. However, the motion to sever is addressed to the discretion of the trial court, and a denial of severance is not grounds for reversal unless clear prejudice and an abuse of discretion are shown.

Thus, "[a]n abuse of discretion in refusing severance is not alone enough to justify reversal and a new trial. There must also be prejudice. That is, there must be some appreciable chance that [the] defendants would not have been convicted had the separate trial they wanted been granted." *United States v. Bostic,* 713 F.2d 401, 403 (8th Cir.1983).

We find no abuse of discretion in the district court's refusal to grant appellants' motions for severance on the grounds of any "spillover effect." The poor reputation of one's co-defendant or co-defendants alone is not grounds for severance from joint trial. *See, e.g., United States v. Knowles,* 572 F.2d 267, 270 (10th Cir.1978). Moreover, appellants have not carried the "heavy burden" of showing real prejudice. *See, e.g., United States v. Graham,* 548 F.2d 1302, 1311 (8th Cir.1977). In the context of an allegation that incrimi-

nating evidence presented in a joint trial has "spilled over" from one or more defendants to another, we must consider whether the jurors were able to follow the trial court's cautionary instructions and compartmentalize the evidence against each defendant on each count individually. In the present case the jury verdicts strongly indicate that the jury followed the cautionary instructions given by the district court, compartmentalized the evidence and was not confused by the evidence because the jury acquitted one defendant and found appellants guilty of some charges but acquitted on other charges. *See, e.g., United States v. Zicree,* 605 F.2d 1381, 1389 (5th Cir.1979) (citing *Tillman v. United States,* 406 F.2d 930, 935–36 (5th Cir.), *vacated in part on other grounds,* 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969)), *cert. denied,* 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980); *United States v. Boyd,* 595 F.2d 120, 125 (3d Cir.1978).

Thomas argues individually that the district court abused its discretion in denying his motion for severance and that he has shown real prejudice because if he had been tried separately, his co-defendant Carl Civella would have exculpated him.

██ "[I]t is not reversible error to deny severance requested on the ground that a defendant wants to call a co-defendant as a witness, unless the defendant shows that the co-defendant is likely to testify at a separate trial and the testimony would exculpate him [or her]." *United States v. Starr,* 584 F.2d 235, 239 (8th Cir.1978), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1019, 59 L.Ed.2d 73 (1979). Here, counsel for Carl Civella stated *in camera* that Carl Civella had affirmatively represented that he would testify on behalf of Thomas if the trials were severed. That is a sufficient showing that the co-defendant that Thomas wanted to call as a witness would have been likely to testify at a separate trial. "It was not necessary for [Thomas] to prove to a certainty that [Carl Civella] would be available and willing to testify in a separate trial." *Id.*

With respect to the second requirement, Thomas argues that the district court improperly required him to show that the co-defendant's testimony would have been "completely exculpatory." The term "completely exculpatory" would seem to require the defendant to show that the co-defendant's testimony would conclusively establish the defendant's innocence. We agree that such a requirement would be too demanding. However, in view of the strong policies favoring joint trials where permissible, the defendant must show that the co-defendant's testimony would be substantially exculpatory. The defendant must show that the co-defendant's testimony would do more than "merely tend to contradict a few details of the government's case against [him or her]." *United States v. Garcia,* 647 F.2d 794, 796 (8th Cir.) (citing *United States v. Abraham,* 541 F.2d 1234, 1240 (7th Cir.1976), *cert. denied,* 429 U.S. 1102, 97 S.Ct. 1128, 51 L.Ed.2d 553 (1977)), *cert. denied,* 454 U.S. 970, 102 S.Ct. 516, 70 L.Ed.2d 387 (1981).

██ We believe, however, that the improper use of a "completely exculpatory" standard was harmless error under the circumstances. We can discern the substance and exculpatory effect of the desired testimony from the record. During the *in camera* proceeding counsel for Carl Civella stated that Carl Civella's testimony would have contradicted that of Agosto and supported Thomas' defense that Thomas was involved in legitimate investigations of casino finances and Thomas' characterization of the conversations on the Marlo Tape. Even assuming that the proffered testimony, if credited, would have supported Thomas' defense theory, we note, however, that the proffered testimony would have been subject to substantial damaging impeachment, particularly from the Marlo Tape itself and other government evidence. *See United States v. Finkelstein,* 526 F.2d 517, 524 (2d Cir.1975), *cert. denied,* 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976). We have carefully reviewed the record and are convinced that, although the question is a close one, the district court did not abuse its discretion in refusing to

grant Thomas' motion for severance on the ground that he wanted to call a co-defendant as a witness.

Thomas also argues that because his defense theory was so inconsistent with and antagonistic to those of his co-defendants, he was unable to testify in his own defense in a joint trial and the district court abused its discretion in refusing to grant his motion for severance on this ground. According to a proffer made *in camera* by Thomas' counsel, Thomas' testimony would have incriminated his co-defendants and as a result his life would have been endangered had he testified.

While there are situations in which inconsistent defenses may support a motion for severance, the doctrine is a limited one.... [T]he governing standard requires the moving defendant to show that "the defendants present conflicting and irreconcilable defenses and there is a danger that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty."

*United States v. Haldeman*, 181 U.S.App. D.C. 245, 559 F.2d 31, 71 (1976) (banc) (citation omitted), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). We hold that the district court did not abuse its discretion in refusing to grant Thomas' motion for severance on the ground of inconsistent and antagonistic defenses. The conflict between Thomas' defense and those of his co-defendants simply did not reach the level from which the jury would infer from the conflict alone that both Thomas and his co-defendants were guilty. Thomas does not argue that his co-defendants' defenses would inescapably inculpate him; rather, Thomas' defense was inconsistent and antagonistic with those of his co-defendants only because his defense was that he knew nothing about the skimming but that his co-defendant did. "[T]he mere presence of hostility among defendants or the desire of one to exculpate himself [or herself] by inculpating another have both been held to be insufficient grounds to require separate trials." *United States v. Barber*, 442 F.2d 517, 530 (3d

Cir.), *cert. denied*, 404 U.S. 958, 92 S.Ct. 327, 30 L.Ed.2d 275 (1971). "Thus antagonistic defenses do not require the granting of severance even when one defendant takes the stand and blames his [or her] co-defendant for the crime." *United States v. McPartlin*, 595 F.2d 1321, 1334 (7th Cir.) (citations omitted), *cert. denied*, 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979).

Thomas also argues that his trial should have been severed because he would have been able to testify in his own defense in a separate trial. Thomas argues that he could not testify in the joint trial and inculpate his co-defendants without fear for his life. While we in no way depreciate Thomas' fears for his personal safety, we find no abuse of discretion in the district court's denial of severance. According to an *in camera* statement of the government, to the use of which Thomas does not object, the risk to Thomas' life was believed to be relatively constant whether he decided to testify in his own defense in the joint trial or in a separate trial.

*Speedy Trial*

Chiavola was indicted in November 1981 and was brought to trial on May 31, 1983, eighteen months after the indictment. The case was originally set for trial on December 28, 1981. In the interim from December 1981 to May 1983, the district court granted a number of motions for continuance filed by Chiavola's co-defendants.

Chiavola argues that the district court's denial of his motions for immediate trial and his motions to dismiss violated his right to a speedy trial, guaranteed by the sixth amendment, the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.* (1982), and Fed.R. Crim.P. 48(b). The district court denied the motions for immediate trial and made findings pursuant to § 3161(h)(8)(A).

The sixth amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." "[A]ny inquiry into a speedy trial claim necessitates a functional analy-

sis of the right in the particular context of the case: 'The right of a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances. It secures rights to a defendant. It does not preclude the rights of public justice.'" *Barker v. Wingo,* 407 U.S. 514, 522, 92 S.Ct. 2182, 2187, 33 L.Ed.2d 101 (1972) (citations omitted). The Supreme Court has identified four factors which courts should consider in determining whether a particular defendant has been deprived of this right: the length of the delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant. *Id.* at 530, 92 S.Ct. at 2192.

■ We consider first the reason for the eighteen-month delay between the indictment and trial. The district court continued the case at the request of Chiavola's co-defendants and ordered the parties to submit a monthly status report on their discovery activities. Extensive discovery, which began in November 1981, continued throughout 1982. On December 3, 1982, the district court granted the motion of co-defendant Nick Civella for a continuance from February 7, 1983, to April 11, 1983, in part because of a scheduling conflict of the lead defense counsel on the pretrial motions. On March 10, 1983, the district court again continued the case to May 16, 1983, on the motion of all the defendants except Chiavola in order to accommodate pretrial motions and a "more orderly trial preparation." On May 10, 1983, the case was continued to May 31, 1983, in order to obtain stipulations.

We next consider what prejudice, if any, resulted to Chiavola as a result of the eighteen-month delay. "Prejudice, of course, should be assessed in light of the interests of defendants which the speedy trial right was designed to protect ... [1] to prevent oppressive pretrial incarceration; [2] to minimize anxiety and concern of the accused; and [3] to limit the possibility that the defense will be impaired." *Id.* at 532, 92 S.Ct. at 2193. *See United States v. MacDonald,* 456 U.S. 1, 8, 102 S.Ct. 1497, 1502, 71 L.Ed.2d 696 (1982). Chiavola ar-

gues that he was prejudiced by the "anxiety of waiting 18 months for a trial ... [and the] constraints on his liberty stemming from bond restrictions." Chiavola does not claim that he was hampered in his defense by this delay.

We hold that Chiavola's sixth amendment right to a speedy trial was not violated by the eighteen-month delay. The district court granted the continuances at the request of Chiavola's co-defendants, the continuances were necessary to adequate preparation for trial and reasonable considering the complexity of the case, and Chiavola was not hampered in his defense by the delay. Any prejudice to Chiavola resulting from the denial of his request for a new trial is outweighed by the public interest in bringing this complex case to trial in an orderly fashion.

■ Chiavola also asserts that the delay violated the Speedy Trial Act. The Act states in relevant part:

[T]he trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs....

....

The following periods of delay shall be excluded in computing the time ... within which the trial of any such offense must commence:

....

(7) A reasonable period of delay when the defendant is joined for trial with a co-defendant as to whom the time for trial has not run and no motion for severance has been granted.

(8)(A) Any period of delay resulting from a continuance granted by any judge on his [or her] own motion or at the request of the defendant or his [or her] counsel ... if the judge granted such continuance on the basis of his [or her] findings that the ends served by taking such action outweigh the best

interest of the public and the defendant in a speedy trial.

18 U.S.C. § 3161(c)(1), (h)(7)–(8)(A). We hold that the district court did not abuse its discretion in denying Chiavola's motion for speedy trial as provided by the Speedy Trial Act. The delay was attributable to the pretrial motions of Chiavola's co-defendants and therefore is excluded by the Speedy Trial Act from computation. *E.g., United States v. Campbell,* 706 F.2d 1138, 1141 (11th Cir.1983); *United States v. Stafford,* 697 F.2d 1368, 1372 (11th Cir.1983). There was no deliberate procrastination or negligent inaction on the part of the government. *See, e.g., United States v. Lane,* 561 F.2d 1075, 1077–78 (2d Cir.1977).

▆▆▆ Chiavola next argues that the district court abused its discretion in denying the motion to dismiss for want of prosecution under Fed.R.Crim.P. 48(b). This rule imposes a more stringent standard than the sixth amendment, *United States v. DeLeo,* 422 F.2d 487, 495 (1st Cir.), *cert. denied,* 397 U.S. 1037, 90 S.Ct. 1355, 25 L.Ed.2d 648 (1970), and permits dismissal even though there has been no constitutional violation. *E.g., United States v. Carlson,* 697 F.2d 231, 236 (8th Cir.1983). "Dismissal under this rule is discretionary and is governed by the same general considerations as the Sixth Amendment." *Id., citing United States v. Crow Dog,* 532 F.2d 1182, 1194 (8th Cir.1976), *cert. denied,* 430 U.S. 929, 97 S.Ct. 1547, 51 L.Ed.2d 772 (1977); *see United States v. Tantalo,* 680 F.2d 903, 909 (2d Cir.1982). We hold that the district court did not abuse its discretion in denying the motion to dismiss for want of prosecution. The delay was the result of the need of the prosecution and defense to prepare for the trial of very complicated charges. There was no purposeful delay by the government.

*Sufficiency of the Evidence*

**Moretina**

Moretina was convicted of conspiracy and three counts of interstate transportation of stolen money in excess of $5,000 or aiding or abetting therein. Moretina argues that there was no evidence of any conduct engaged in by him, which, independent of the co-conspirator testimony, established that he became a member of the conspiracy and knowingly agreed to accomplish the alleged conspiratorial goals. Moretina further argues that there was insufficient nonhearsay evidence connecting him to the conspiracy so as to render co-conspirator statements admissible against him. Moretina argues that the references to his contact with the other defendants, his presence or the presence of his automobile at certain places establish bare association only. Moretina also argues that it is significant that he was not present at the Marlo meeting attended by a number of the defendants and at which casino skimming techniques were discussed.

"[A]n out-of-court declaration of a co-conspirator is admissible against a defendant if the government demonstrates (1) that a conspiracy existed; (2) that the defendant and the declarant were members of the conspiracy; and (3) that the declaration was made during the course and in furtherance of the conspiracy." *United States v. Bell,* 573 F.2d at 1043. The district court must make a preliminary determination that the independent evidence proves by a preponderance that the defendant was involved in a conspiracy and that the out-of-court statement was made during the course and in furtherance of the conspiracy. *Id.* at 1043–44. The proof may be "totally circumstantial," *United States v. Terry,* 702 F.2d 299, 320 (2d Cir.), *cert. denied,* 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983) (citations omitted), and "the court must view the evidence as a whole rather than consider individual items in isolation." *Id.* (citations omitted).

▆▆▆ We hold that the government's independent evidence considered as a whole proved by a preponderance that a conspiracy existed and that Moretina was one of the conspirators. Agosto's testimony, which was corroborated by the Marlo tape, established the existence of a conspiracy. The government introduced the nonhearsay evidence that Moretina was a member of

the conspiracy. Agosto testified that De-Luna introduced Moretina to Agosto as his "associate" in 1975, that Moretina was frequently present when DeLuna picked up Agosto at the Kansas City airport and that the three of them would discuss Agosto's progress in infiltrating and obtaining control of the Tropicana and the "skimming operation." Agosto also spoke to Moretina by phone when DeLuna was unavailable and asked Moretina to relay messages concerning the Tropicana to DeLuna. The FBI agents also observed Moretina entering and leaving a Kansas City hotel where the co-conspirators met; observed DeLuna or DeLuna's car at Moretina's residence; on September 7, 1978, observed Tamburello, Nick Civella, and DeLuna talking together; and on February 9, 1979, observed Moretina driving his car, with DeLuna as a passenger, in the vicinity of Caruso's office, where his car was later seen parked, and observed DeLuna and Moretina later driving away together. Tapes also revealed Moretina and DeLuna discussing possible meetings; some of these tapes were secretive in tone.

 In reviewing a denial of a motion for a judgment of acquittal, we must view the evidence in the light most favorable to the government and must give the government the benefit of all reasonable inferences that may logically be drawn from the evidence. *United States v. Smith*, 680 F.2d 255, 259 (1st Cir.1982), *cert. denied*, 459 U.S. 1110, 103 S.Ct. 738, 74 L.Ed.2d 960 (1983); *United States v. Anziano*, 606 F.2d 242, 244 (8th Cir.1979). "A motion for acquittal should be granted only where 'the evidence viewed in the light most favorable to the Government, is such that a reasonably minded jury *must* have a reasonable doubt as to the existence of any of the essential elements of the crime charged.' " *United States v. White*, 562 F.2d 587, 589 (8th Cir.1977) (per curiam) (citations omitted; emphasis in original).

 "Once the existence of a conspiracy is established, evidence establishing beyond a reasonable doubt a connection of a defendant with the conspiracy, even though the connection is slight, is sufficient to convict him of knowing participation in the conspiracy." *United States v. Dunn*, 564 F.2d 348, 357 (9th Cir.1977). A defendant's participation in a conspiracy must be established with proof that the defendant knowingly contributed efforts in furtherance of it. *United States v. Brown*, 584 F.2d 252, 262 (8th Cir.1978), *cert. denied*, 440 U.S. 910, 99 S.Ct. 1220, 59 L.Ed.2d 458 (1979).

We hold that the evidence was sufficient for a jury to infer [1] that Moretina had a "slight connection" to the conspiracy and transported stolen money in interstate commerce. In addition to the nonhearsay evidence discussed above, the government introduced the following hearsay evidence of Moretina's participation in the conspiracy. Agosto testified that both DeLuna and Caruso told him that Moretina's role was to pick up skim money when Caruso arrived in Kansas City and to deliver it to DeLuna for distribution. DeLuna also told Agosto to talk to Moretina "about anything without reservation." DeLuna's code name "CP" was shown to be that of Moretina. Additionally, DeLuna's notes reflect that "CP" (Moretina) received $5,000 from moneys delivered on November 8, 1978, by Caruso. Additionally, notes (Exs. 64 and 64b) seized from Carl Civella's residence in tandem show that "Charlie" (Moretina) received "10%" of the "skimmed" money, ranking just below Nick Civella, Carl Civella and Carl DeLuna.

### Chiavola

 Chiavola was convicted of conspiracy and one count of interstate transportation of stolen property. Chiavola argues that there was no evidence that he participated in the conspiracy, had any knowledge of the skimming activity, participated in the actual movement of $17,500 from Kansas City to Chicago, Illinois, or performed any acts which aided or abetted the transportation of stolen property.

The existence of the conspiracy was established by independent, nonhearsay evidence. Agosto testified that a conspiracy existed between him, Nick Civella, and oth-

er defendants. Once the conspiracy was established, co-conspirator statements were admissible against all the defendants. Agosto testified that a portion of the skim money was going to Chicago to some of DeLuna's associates. These transfers of money were documented by DeLuna in coded notes, which contained code names for defendants and other conspirators. Chiavola was called "Stomp" and was referred to in the notes as "Stmp", "Stp", and "Stm." The notes indicate that DeLuna met with "Stmp to work out details to start meeting stmp for papers [money] in the future" and that on September 8, 1978, Nick Civella called ("Stm") and told him to hold "35" ($35,000) for Aiuppa.

▆ An appellate court reviewing the denial of a motion for a judgment of acquittal must view the evidence in a light most favorable to the government. *United States v. Anziano*, 606 F.2d at 244. "To establish aiding and abetting the government is required to show that the defendant associated himself with the unlawful venture, that he participated in it as something he wished to bring about, and that he sought by his action to make it succeed." *Id.* at 244–45 (citations omitted). "[S]ome affirmative participation [by the defendant] which at least encourages the perpetrator [must be shown]." *Id.* at 245. We hold that there was sufficient evidence from which the jury could have inferred that Chiavola was a member of the conspiracy and transported stolen money in interstate commerce.

Accordingly, the judgments of the district court are affirmed. The government's motion to strike portions of appellant Chiavola's Reply Brief is denied.

## APPENDIX

Nev.Rev.Stat. § 463.130, .160, .170, .200, .335, .360, .530 (in effect on January 1, 1975):

**463.130**

1. It is hereby declared to be the policy of this state that all establishments where gambling games are conducted or operated or where gambling devices are operated and manufacturers, sellers and distributors of certain gambling devices and equipment in the State of Nevada shall be licensed and controlled so as to protect the public health, safety, morals, good order and general welfare of the inhabitants of the State of Nevada, and to preserve the competitive economy and the policies of free competition of the State of Nevada.

2. Any license issued pursuant to this chapter shall be deemed to be a revocable privilege and no holder thereof shall be deemed to have acquired any vested rights therein or thereunder.

**463.160**

1. It is unlawful for any person, either as owner, lessee or employee, whether for hire or not, either solely or in conjunction with others:

(a) To deal, operate, carry on, conduct, maintain or expose for play in the State of Nevada any game or slot machine as defined in this chapter, or to operate, carry on, conduct or maintain any horserace book or sports pool; or

(b) To provide or maintain any information service the primary purpose of which is to aid the placing or making of wagers on events of any kind; or

(c) To receive, directly or indirectly, any compensation or reward or any percentage or share of the money or property played, for keeping, running or carrying on any game, slot machine, horserace book or sports pool,

without having first procured, and thereafter maintaining in full force and effect, all federal, state, county and municipal gaming licenses as required by statute or ordinance or by the governing board of any unincorporated city or town.

2. It is unlawful for any person to lend, let, lease or otherwise deliver or furnish any equipment of any gambling game, including any slot machine, for any interest or any percentage or share of the money or property played, under guise of any agreement whatever, without having first procured a state gaming license for the same.

3. It is unlawful for any person to lend, let, lease or otherwise deliver or furnish, except by a bona fide sale, any slot machine under guise of any agreement whatever whereby any consideration whatever is paid or is payable for the right to possess or use such slot machine, whether such consideration is measured by a percentage of the revenue derived from such machine or by a fixed fee or otherwise, without having first procured a state gaming license for the same.

4. It is unlawful for any person to furnish services or property, real or personal, on a contract, lease or license basis, pursuant to which such person receives payments based on earnings or profits or otherwise from any gambling game, including any slot machine, without having first procured a state gaming license.

5. Any person who shall knowingly permit any gambling game, slot machine or device to be conducted, operated, dealt or carried on in any house or building or other premises owned by him, in whole or in part, except by a person who is licensed hereunder, or his employee, shall be guilty of a gross misdeameanor.

6. Any licensee who puts additional games or slot machines into play or displays such games or slot machines in a public area without authority of the commission to do so is subject to the penalties provided in NRS 463.310.

7. The provisions of subsections 2, 3 and 4 do not apply to any person:

(a) Whose payments are a fixed sum determined in advance on a bona fide basis for the furnishing of services or property other than a slot machine.

(b) Who furnishes services or property under a bona fide rental agreement or security agreement for gaming equipment.

(c) Which is a wholly owned subsidiary of:

(1) A corporation holding a state gaming license; or

(2) A holding company or intermediary company, or publicly traded corporation, which has registered pursuant to NRS 463.-585 or 463.635 and which has fully complied with the laws applicable to it as such. Receipts or rentals or charges for real property, personal property or services do not lose their character as payments of a fixed sum or as bona fide because of contract, lease or license provisions for adjustments in charges, rentals or fees on account of changes in taxes or assessments, cost-of-living index escalations, expansions or improvement of facilities, or changes in services supplied; and receipts of percentage rentals or percentage charges between a corporate licensee and the entities enumerated in paragraph (c) are permitted under this subsection.

8. The commission may determine the suitability, or may require the licensing, of any person who furnishes services or property to a state gaming licensee under any arrangement pursuant to which such person receives payments based on earnings, profits or receipts from gaming. The commission may require any such person to comply with the requirements of this chapter and with the regulations of the commission. If the commission determines that any such person is unsuitable, it may require such arrangement to be terminated.

**463.170**

1. Any person who the commission shall determine is a suitable person to receive a license under the provisions of this chapter, having due consideration for the proper protection of the public health, safety, morals, good order and general welfare of the inhabitants of the State of Nevada, may be issued a state gaming license. The burden of proving his qualification to receive or hold any license hereunder shall be at all times on the applicant or licensee.

2. The commission may in its discretion grant a license to a corporation which has complied with the provisions of NRS 463.-490 to 463.530, inclusive.

3. No limited partnership, business trust or organization or other association of a quasi-corporate character shall be eligible to receive or hold any license under this chapter unless all persons having any

direct or indirect interest therein of any nature whatsoever, whether financial, administrative, policymaking or supervisory, are individually qualified to be licensed under the provisions of this chapter.

4. The commission may, by regulation, limit the number of persons who may be financially interested and the nature of such interest in any corporation or other organization or association licensed under this chapter, and establish such other qualifications for licenses as they may, in their uncontrolled discretion, deem to be in the public interest.

**463.200**

1. Application for a state gaming license shall be made to the board on forms furnished by the board and in accordance with the regulations of the commission.

2. The application shall include:

(a) The name of the proposed licensee.

(b) The location of his place or places of business.

(c) The gambling games, gaming device or slot machines to be operated.

(d) The names of all persons directly or indirectly interested in the business and the nature of such interest.

(e) Such other information and details as the board may require in order to discharge its duty properly.

3. The board shall furnish to the applicant supplemental forms, which the applicant shall complete and file with the application. Such supplemental forms shall require, but shall not be limited to, complete information and details with respect to the applicant's antecedents, habits, character, criminal record, business activities, financial affairs and business associates, covering at least a 10-year period immediately preceding the date of filing of the application.

**463.335**

1. As used in this section:

(a) "Gaming employee" means any person connected directly with the operation of a nonrestricted establishment, and includes without limitation:

(1) Boxmen;

(2) Cashiers;

(3) Dealer;

(4) Floormen;

(5) Hosts or other persons empowered to extend credit or complimentary services;

(6) Keno runners;

(7) Keno writers;

(8) Machine mechanics;

(9) Security personnel;

(10) Shift or pit bosses;

(11) Shills; and

(12) Supervisors or managers.

"Gaming employee" does not include bartenders, cocktail waitresses or other persons engaged in preparing or serving food or beverages.

(b) "Nonrestricted establishment" means any establishment except one in which slot machines only are operated incidentally to some other primary business of the licensee.

(c) "Temporary work permit" means a work permit which is valid only for a period not to exceed 30 days from its date of issue and is not renewable.

(d) "Work permit" means any card, certificate or permit issued by the board or by a county or city licensing authority, whether denominated as a work permit, registration card or otherwise, authorizing the employment of the holder as a gaming employee.

2. The legislature finds that, to protect and promote the public health, safety, morals, good order and general welfare of the inhabitants of the State of Nevada and to carry out the policy declared in NRS 463.-130, it is necessary that the board:

(a) Ascertain and keep itself informed of the identity, prior activities and present location of all gaming employees in the State of Nevada; and

(b) Maintain confidential records of such information.

3. No person may be employed as a gaming employee unless he is the holder of:

(a) A valid work permit issued in accordance with the applicable ordinances or regulations of the county or city in which his duties are performed; or

(b) If no work permit is required by either such county or such city, a work permit issued by the board.

4. Whenever any person applies for the issuance or renewal of a work permit, the county or city officer or employee to whom such application is made shall within 24 hours mail or deliver a copy thereof to the board, and may at the discretion of the county or city licensing authority issue a temporary work permit. If within 30 days after the mailing or delivery of the copy of the application, the board has not notified the county or city licensing authority of any objection, such authority may in its discretion issue or deny a work permit to the applicant.

5. If the board within the 30-day period notifies the county or city licensing authority that the board objects to the granting of a work permit to the applicant, such authority shall deny the work permit and shall immediately revoke and repossess any temporary work permit which it may have issued.

6. Application for a work permit, valid wherever a work permit is not required by any county or city licensing authority, may be made to the board, and may be granted or denied for any cause deemed reasonable by the board.

7. Any person whose application for a work permit has been denied because of an objection by the board or whose application for a work permit has been denied by the board may apply to the board for a hearing. At such hearing, the board or any designated member of the board or an examiner appointed by the board shall take any testimony deemed necessary. After such hearing the board shall review the testimony taken and any other evidence in its files, and shall within 30 days from the date of the hearing announce its decision sustaining or reversing the denial of the work permit or the objection to issuance of a work permit. Such decision may be made upon any ground deemed reasonable by the board, and shall be conclusive unless reversed as provided in subsection 8.

8. Any applicant aggrieved by the decision of the board may, within 15 days after the announcement of the decision, apply in writing to the commission for review of the decision. Such review shall be limited to the record, any testimony submitted and the files in the case. The commission may sustain or reverse the board's decision. The decision of the commission shall be conclusive on all parties.

9. All records acquired or compiled by the board or commission relating to any application made pursuant to this section are confidential and no part thereof may be disclosed except in the proper administration of this chapter or to an authorized law enforcement agency. All lists of persons to whom work permits have been issued or denied and all records of the names or identity of persons engaged in the gaming industry in this state are confidential and shall not be disclosed except in the proper administration of this chapter or to an authorized law enforcement agency.

**463.360**

1. Conviction by a court of competent jurisdiction of the violation of any of the provisions of this chapter may act as an immediate revocation of any and all licenses which may have been issued to the violator, and, in addition, the court may, upon application of the district attorney of the county or of the commission, order that no new or additional license under this chapter be issued to such violator, or be issued to any person for the room or premises in which such violation occurred, for a period of 1 year from the date of such revocation.

2. Any person who willfully fails to report, pay or truthfully account for and pay over any license fee or tax imposed by the provisions of this chapter, or willfully attempts in any manner to evade or defeat any such license fee, tax or payment there-

of shall be punished by imprisonment in the state prison for not less than 1 year nor more than 6 years, or by a fine of not more than $5,000, or by both fine and imprisonment.

3. The violation of any of the provisions of this chapter, the penalty for which is not herein specifically fixed, is a gross misdemeanor.

**463.530**

All officers and directors of the corporation which holds or applies for a state gaming license must be licensed individually, according to the provisions of this chapter, and if, in the judgment of the commission, the public interest will be served by requiring any or all of the corporation's individual stockholders, lenders, holders of evidence of indebtedness, underwriters, key executives, agents or employees to be licensed, the corporation shall require such persons to apply for a license in accordance with the laws and requirements in effect at the time the commission requires such licensing.

Nev.Rev.Stat. § 463.130, .160, .170, .200, .335, .360, .530 (in effect from March 27, 1975 until July 1, 1977):

**463.130**

1. It is hereby declared to be the policy of this state that all establishments where gambling games are conducted or operated or where gambling devices are operated and manufacturers, sellers and distributors of certain gambling devices and equipment in the State of Nevada shall be licensed and controlled so as to protect the public health, safety, morals, good order and general welfare of the inhabitants of the State of Nevada, and to preserve the competitive economy and the policies of free competition of the State of Nevada.

2. Any license issued pursuant to this chapter shall be deemed to be a revocable privilege and no holder thereof shall be deemed to have acquired any vested rights therein or thereunder.

**463.160**

1. It is unlawful for any person, either as owner, lessee or employee, whether for hire or not, either solely or in conjunction with others:

(a) To deal, operate, carry on, conduct, maintain or expose for play in the State of Nevada any game or slot machine as defined in this chapter, or to operate, carry on, conduct or maintain any horserace book or sports pool; or

(b) To provide or maintain any information service the primary purpose of which is to aid the placing or making of wagers on events of any kind; or

(c) To receive, directly or indirectly, any compensation or reward or any percentage or share of the money or property played, for keeping, running or carrying on any game, slot machine, horserace book or sports pool,

without having first procured, and thereafter maintaining in full force and effect, all federal, state, county and municipal gaming licenses as required by statute or ordinance or by the governing board of any unincorporated city or town.

2. It is unlawful for any person to lend, let, lease or otherwise deliver or furnish any equipment of any gambling game, including any slot machine, for any interest or any percentage or share of the money or property played, under guise of any agreement whatever, without having first procured a state gaming license for the same.

3. It is unlawful for any person to lend, let, lease or otherwise deliver or furnish, except by a bona fide sale, any slot machine under guise of any agreement whatever whereby any consideration whatever is paid or is payable for the right to possess or use such slot machine, whether such consideration is measured by a percentage of the revenue derived from such machine or by a fixed fee or otherwise, without having first procured a state gaming license for the same.

4. It is unlawful for any person to furnish services or property, real or personal, on a contract, lease or license basis, pursuant to which such person receives payments based on earnings or profits or otherwise from any gambling game, including

any slot machine, without having first procured a state gaming license.

5. Any person who shall knowingly permit any gambling game, slot machine or device to be conducted, operated, dealt or carried on in any house or building or other premises owned by him, in whole or in part, except by a person who is licensed hereunder, or his employee, shall be guilty of a gross misdemeanor.

6. Any licensee who puts additional games or slot machines into play or displays such games or slot machines in a public area without authority of the commission to do so is subject to the penalties provided in NRS 463.310.

7. The provisions of subsections 2, 3 and 4 do not apply to any person:

(a) Whose payments are a fixed sum determined in advance on a bona fide basis for the furnishing of services or property other than a slot machine.

(b) Who furnishes services or property under a bona fide rental agreement or security agreement for gaming equipment.

(c) Which is a wholly owned subsidiary of:

(1) A corporation holding a state gaming license; or

(2) A holding company or intermediary company, or publicly traded corporation, which has registered pursuant to NRS 463.-585 or 463.635 and which has fully complied with the laws applicable to it as such. Receipts or rentals or charges for real property, personal property or services do not lose their character as payments of a fixed sum or as bona fide because of contract, lease or license provisions for adjustments in charges, rentals or fees on account of changes in taxes or assessments, cost-of-living index escalations, expansions or improvement of facilities, or changes in services supplied; and receipts of percentage rentals or percentage charges between a corporate licensee and the entities enumerated in paragraph (c) are permitted under this subsection.

8. The commission may determine the suitability, or may require the licensing, of any person who furnishes services or property to a state gaming licensee under any arrangement pursuant to which such person receives payments based on earnings, profits or receipts from gaming. The commission may require any such person to comply with the requirements of this chapter and with the regulations of the commission. If the commission determines that any such person is unsuitable, it may require such arrangement to be terminated.

9. If the premises of a licensed gaming establishment are directly or indirectly owned or under the control of the licensee therein, or of any person controlling, controlled by, or under common control with such licensee, the commission may, upon recommendation of the board, require the licensee to present the application of any business or person doing business on the premises for a determination of suitability to be associated with a gaming enterprise in accordance with the procedures set forth in this chapter. If the commission determines that such business or person is unsuitable to be associated with a gaming enterprise, such association shall be terminated. Any agreement which entitles a business other than gaming to be conducted on such premises is subject to termination upon a finding of unsuitability of the business or of any person associated therewith. Every such agreement shall be deemed to include a provision for its termination without liability on the part of the licensee upon a finding by the commission that the business or any person associated therewith is unsuitable to be associated with a gaming enterprise. Failure expressly to include such a condition in the agreement is not a defense in any action brought pursuant to this section to terminate the agreement. If the application is not presented to the board within 30 days following demand or the unsuitable association is not terminated, the commission may pursue any remedy or combination of remedies provided in this chapter.

**463.170**

1. Any person who the commission shall determine is a suitable person to receive a license under the provisions of this chapter, having due consideration for the proper protection of the public health, safety, morals, good order and general welfare of the inhabitants of the State of Nevada, may be issued a state gaming license. The burden of proving his qualification to receive or hold any license hereunder shall be at all times on the applicant or licensee.

2. The commission may in its discretion grant a license to a corporation which has complied with the provisions of NRS 463.-490 to 463.530, inclusive.

3. No limited partnership, business trust or organization or other association of a quasi-corporate character shall be eligible to receive or hold any license under this chapter unless all persons having any direct or indirect interest therein of any nature whatsoever, whether financial, administrative, policymaking or supervisory, are individually qualified to be licensed under the provisions of this chapter.

4. The commission may, by regulation, limit the number of persons who may be financially interested and the nature of such interest in any corporation or other organization or association licensed under this chapter, and establish such other qualifications for licenses as they may, in their uncontrolled discretion, deem to be in the public interest.

**463.200**

1. Application for a state gaming license or other commission action shall be made to the board on forms furnished by the board and in accordance with the regulations of the commission.

2. The application for a license shall include:

(a) The name of the proposed licensee.

(b) The location of his place or places of business.

(c) The gambling games, gaming device or slot machines to be operated.

(d) The names of all persons directly or indirectly interested in the business and the nature of such interest.

(e) Such other information and details as the board may require in order to discharge its duty properly.

3. The board shall furnish to the applicant supplemental forms, which the applicant shall complete and file with the application. Such supplemental forms shall require, but shall not be limited to, complete information and details with respect to the applicant's antecedents, habits, character, criminal record, business activities, financial affairs and business associates, covering at least a 10-year period immediately preceding the date of filing of the application.

**463.335**

1. As used in this section:

(a) "Gaming employee" means any person connected directly with the operation of a nonrestricted establishment, and includes without limitation:

(1) Boxmen;

(2) Cashiers;

(3) Dealers;

(4) Floormen;

(5) Hosts or other persons empowered to extend credit or complimentary services;

(6) Keno runners;

(7) Keno writers;

(8) Machine mechanics;

(9) Security personnel;

(10) Shift or pit bosses;

(11) Shills; and

(12) Supervisors or managers.

"Gaming employee" does not include bartenders, cocktail waitresses or other persons engaged in preparing or serving food or beverages.

(b) "Nonrestricted establishment" means any establishment except one in which slot machines only are operated incidentally to some other primary business of the licensee.

(c) "Temporary work permit" means a work permit which is valid only for a period not to exceed 30 days from its date of issue and is not renewable.

(d) "Work permit" means any card, certificate or permit issued by the board or by a county or city licensing authority, whether denominated as a work permit, registration card or otherwise, authorizing the employment of the holder as a gaming employee.

2. The legislature finds that, to protect and promote the public health, safety, morals, good order and general welfare of the inhabitants of the State of Nevada and to carry out the policy declared in NRS 463.-130, it is necessary that the board:

(a) Ascertain and keep itself informed of the identity, prior activities and present location of all gaming employees in the State of Nevada; and

(b) Maintain confidential records of such information.

3. No person may be employed as a gaming employee unless he is the holder of:

(a) A valid work permit issued in accordance with the applicable ordinances or regulations of the county or city in which his duties are performed; or

(b) If no work permit is required by either such county or such city, a work permit issued by the board.

4. Whenever any person applies for the issuance or renewal of a work permit, the county or city officer or employee to whom such application is made shall within 24 hours mail or deliver a copy thereof to the board, and may at the discretion of the county or city licensing authority issue a temporary work permit. If within 30 days after receipt by the board of the copy of the application, the board has not notified the county or city licensing authority of any objection, such authority may in its discretion issue or deny a work permit to the applicant. Any holder of a work permit must obtain renewal of the permit from the issuing agency within 10 days following any change of place of employment.

5. If the board within the 30-day period notifies the county or city licensing authority that the board objects to the granting of a work permit to the applicant, such authority shall deny the work permit and shall immediately revoke and repossess any temporary work permit which it may have issued.

6. Application for a work permit, valid wherever a work permit is not required by any county or city licensing authority, may be made to the board, and may be granted or denied for any cause deemed reasonable by the board.

7. Any person whose application for a work permit has been denied because of an objection by the board or whose application for a work permit has been denied by the board may apply to the board for a hearing. At such hearing, the board or any designated member of the board or an examiner appointed by the board shall take any testimony deemed necessary. After such hearing the board shall review the testimony taken and any other evidence in its files, and shall within 30 days from the date of the hearing announce its decision sustaining or reversing the denial of the work permit or the objection to issuance of a work permit. Such decision may be made upon any ground deemed reasonable by the board, and shall be conclusive unless reversed as provided in subsection 8.

8. Any applicant aggrieved by the decision of the board may, within 15 days after the announcement of the decision, apply in writing to the commission for review of the decision. Such review shall be limited to the record, any testimony submitted and the files in the case. The commission may sustain or reverse the board's decision. The decision of the commission shall be subject to judicial review pursuant to NRS 463.315.

9. All records acquired or compiled by the board or commission relating to any application made pursuant to this section are confidential and no part thereof may be disclosed except in the proper administration of this chapter or to an authorized law

enforcement agency. All lists of persons to whom work permits have been issued or denied and all records of the names or identity of persons engaged in the gaming industry in this state are confidential and shall not be disclosed except in the proper administration of this chapter or to an authorized law enforcement agency.

#### 463.360

1. Conviction by a court of competent jurisdiction of the violation of any of the provisions of this chapter may act as an immediate revocation of any and all licenses which may have been issued to the violator, and, in addition, the court may, upon application of the district attorney of the county or of the commission, order that no new or additional license under this chapter be issued to such violator, or be issued to any person for the room or premises in which such violation occurred, for a period of 1 year from the date of such revocation.

2. Any person who willfully fails to report, pay or truthfully account for and pay over any license fee or tax imposed by the provisions of this chapter, or willfully attempts in any manner to evade or defeat any such license fee, tax or payment thereof shall be punished by imprisonment in the state prison for not less than 1 year nor more than 6 years, or by a fine of not more than $5,000, or by both fine and imprisonment.

3. The violation of any of the provisions of this chapter, the penalty for which is not herein specifically fixed, is a gross misdemeanor.

#### 463.530

All officers and directors of the corporation which holds or applies for a state gaming license must be licensed individually, according to the provisions of this chapter, and if, in the judgment of the commission, the public interest will be served by requiring any or all of the corporation's individual stockholders, lenders, holders of evidence of indebtedness, underwriters, key executives, agents or employees to be licensed, the corporation shall require such persons to apply for a license in accordance with the laws and requirements in effect at the time the commission requires such licensing.

Nev.Rev.Stat. § 463.130, .160, .165, .170, .200, .335, .339, .360, .530 (in effect from July 1, 1977 until July 1, 1979):

#### 463.130

1. The legislature hereby finds, and declares to be the public policy of this state, that:

(a) The gaming industry is vitally important to the economy of the state and the general welfare of the inhabitants.

(b) The continued growth and success of the gaming industry is dependent upon public confidence and trust that licensed gaming is conducted honestly and competitively and that the gaming industry is free from criminal and corruptive elements.

(c) Public confidence and trust can only be maintained by strict regulation of all persons, locations, practices, associations and activities related to the operation of licensed gaming establishments and the manufacture or distribution of gambling devices and equipment.

(d) All establishments where gaming is conducted and where gambling devices are operated, and manufacturers, sellers and distributors of certain gambling devices and equipment in the state shall therefore be licensed, controlled and assisted to protect the public health, safety, morals, good order and general welfare of the inhabitants of the state and to preserve the competitive economy and policies of free competition of the State of Nevada.

2. No applicant for a license or other affirmative commission approval has any right to a license or the granting of the approval sought. Any license issued or other commission approval granted pursuant to the provisions of this chapter or chapter 464 of NRS is a revocable privilege, and no holder acquires any vested right therein or thereunder.

#### 463.160

1. It is unlawful for any person, either as owner, lessee or employee, whether for

hire or not, either solely or in conjunction with others:

(a) To deal, operate, carry on, conduct, maintain or expose for play in the State of Nevada any game or slot machine as defined in this chapter, or to operate, carry on, conduct or maintain any horserace book or sports pool;

(b) To provide or maintain any information service the primary purpose of which is to aid the placing or making of wagers on events of any kind; or

(c) To receive, directly or indirectly, any compensation or reward or any percentage or share of the money or property played, for keeping, running or carrying on any game, slot machine, horserace book or sports pool,

without having first procured, and thereafter maintaining in full force and effect, all federal, state, county and municipal gaming licenses as required by statute or ordinance or by the governing board of any unincorporated city or town.

2. It is unlawful for any person to lend, let, lease or otherwise deliver or furnish any equipment of any gambling game, including any slot machine, for any interest or any percentage or share of the money or property played, under guise of any agreement whatever, without having first procured a state gaming license for the same.

3. It is unlawful for any person to lend, let, lease or otherwise deliver or furnish, except by a bona fide sale or capital lease, any slot machine under guise of any agreement whatever whereby any consideration whatever is paid or is payable for the right to possess or use such slot machine, whether such consideration is measured by a percentage of the revenue derived from such machine or by a fixed fee or otherwise, without having first procured a state gaming license for the slot machine.

4. It is unlawful for any person to furnish services or property, real or personal, on a contract, lease or license basis, pursuant to which such person receives payments based on earnings or profits or otherwise from any gambling game, including

any slot machine, without having first procured a state gaming license.

5. Any person who shall knowingly permit any gambling game, slot machine or device to be conducted, operated, dealt or carried on in any house or building or other premises owned by him, in whole or in part, except by a person who is licensed hereunder, or his employee, is guilty of a gross misdemeanor.

6. Any licensee who puts additional games or slot machines into play or displays such games or slot machines in a public area without authority of the commission to do so is subject to the penalties provided in NRS 463.310.

7. The provisions of subsections 2, 3 and 4 do not apply to any person:

(a) Whose payments are a fixed sum determined in advance on a bona fide basis for the furnishing of services or property other than a slot machine.

(b) Who furnishes services or property under a bona fide rental agreement or security agreement for gaming equipment.

(c) Which is a wholly owned subsidiary of:

(1) A corporation holding a state gaming license; or

(2) A holding company or intermediary company, or publicly traded corporation, which has registered pursuant to NRS 463.585 or 463.635 and which has fully complied with the laws applicable to it as such.

(d) Who is licensed as a distributor and who rents or leases any equipment of any gambling game including any slot machine, under a bona fide agreement where the payments are a fixed sum determined in advance and not determined as a percentage of the revenue derived from the equipment or slot machine.

Receipts or rentals or charges for real property, personal property or services do not lose their character as payments of a fixed sum or as bona fide because of contract, lease or license provisions for adjustments in charges, rentals or fees on account of changes in taxes or assessments,

cost-of-living index escalations, expansions or improvement of facilities, or changes in services supplied; and receipts of percentage rentals or percentage charges between a corporate licensee and the entities enumerated in paragraph (c) are permitted under this subsection.

8. The commission may determine the suitability, or may require the licensing, of any person who furnishes services or property to a state gaming licensee under any arrangement pursuant to which such person receives payments based on earnings, profits or receipts from gaming. The commission may require any such person to comply with the requirements of this chapter and with the regulations of the commission. If the commission determines that any such person is unsuitable, it may require such arrangement to be terminated.

9. If the premises of a licensed gaming establishment are directly or indirectly owned or under the control of the licensee therein, or of any person controlling, controlled by, or under common control with such licensee, the commission may, upon recommendation of the board, require the licensee to present the application of any business or person doing business on the premises for a determination of suitability to be associated with a gaming enterprise in accordance with the procedures set forth in this chapter. If the commission determines that such business or person is unsuitable to be associated with a gaming enterprise, such association shall be terminated. Any agreement which entitles a business other than gaming to be conducted on such premises is subject to termination upon a finding of unsuitability of the business or of any person associated therewith. Every such agreement shall be deemed to include a provision for its termination without liability on the part of the licensee upon a finding by the commission that the business or any person associated therewith is unsuitable to be associated with a gaming enterprise. Failure expressly to include such a condition in the agreement is not a defense in any action brought pursuant to this section to terminate the agreement.

If the application is not presented to the board within 30 days following demand or the unsuitable association is not terminated, the commission may pursue any remedy or combination of remedies provided in this chapter.

**463.165**

1. Except for persons associated with licensed corporations and required to be licensed by NRS 463.530, each employee, agent, guardian, personal representative, lender or holder of indebtedness of a gaming licensee who, in the opinion of the commission, has the power to exercise a significant influence over the licensee's operation of a gaming establishment may be required to apply for a license.

2. A person required to be licensed pursuant to subsection 1 shall apply for a license within 30 days after the commission requests that he do so.

3. If an employee required to be licensed under subsection 1:

(a) Does not apply for a license within 30 days after being requested to do so by the commission, and the commission makes a finding of unsuitability for such reason;

(b) Is denied a license because of a lack of good character, honesty or integrity; or

(c) Has his license revoked by the commission, the gaming licensee by whom he is employed shall terminate his employment upon notification by registered or certified mail to the licensee of such action.

4. A gaming licensee shall not pay to a person who has been terminated pursuant to subsection 3 of this section any remuneration for any service except for amounts due for services rendered before the date of receipt of notice of such action by the commission. Any contract or agreement for personal services or for the conduct of any activity at the licensed gaming establishment between a gaming licensee and a person terminated pursuant to subsection 3 is subject to termination. Every such agreement shall be deemed to include a provision for its termination without liability on the part of the licensee or registered

holding company upon a finding by the commission that the person is unsuitable to be associated with a gaming enterprise. Failure expressly to include such a condition in the agreement is not a defense in any action brought pursuant to this section to terminate the agreement.

5. A gaming licensee shall not enter into any contract or agreement, except a bona fide entertainment contract, with a person who is found unsuitable or who is denied a license because of lack of good character, honesty or integrity or whose license is revoked by the commission or with any business enterprise under the control of that person after the date of receipt of notice of such action by the commission.

6. A gaming licensee shall not employ, except as a bona fide entertainer, any person who is found unsuitable, who has been denied a license because of a lack of good character, honesty or integrity or whose license is revoked by the commission after the date of receipt of notice of such action by the commission, without prior approval of the commission.

### 463.170

1. Any person who the commission determines is qualified to receive a license or be found suitable under the provisions of this chapter, having due consideration for the proper protection of the health, safety, morals, good order and general welfare of the inhabitants of the State of Nevada and the declared policy of this state, may be issued a state gaming license or found suitable. The burden of proving his qualification to receive any license or be found suitable is on the applicant.

2. An application to receive a license or be found suitable shall not be granted unless the commission is satisfied that the applicant is:

(a) A person of good character, honesty and integrity;

(b) A person whose prior activities, criminal record, if any, reputation, habits and associations do not pose a threat to the public interest of this state or to the effective regulation and control of gaming, or

create or enhance the dangers of unsuitable, unfair or illegal practices, methods and activities in the conduct of gaming or the carrying on of the business and financial arrangements incidental thereto; and

(c) In all other respects qualified to be licensed or found suitable consistently with the declared policy of the state.

3. A license to operate a gaming establishment shall not be granted unless the applicant has satisfied the commission that:

(a) He has adequate business probity, competence and experience, in gaming or generally; and

(b) The proposed financing of the entire operation is:

(1) Adequate for the nature of the proposed operation; and

(2) From a suitable source.

Any lender or other source of money or credit which the commission finds does not meet the standards set forth in subsection 2 may be deemed unsuitable.

4. An application to receive a license or be found suitable constitutes a request for a determination of the applicant's general character, integrity, and ability to participate or engage in, or be associated with gaming. Any written or oral statement made in the course of an official proceeding of the board or commission by any member thereof or any witness testifying under oath which is relevant to the purpose of the proceeding is absolutely privileged and does not impose liability for defamation or constitute a ground for recovery in any civil action.

5. The commission may in its discretion grant a license to a corporation which has complied with the provisions of NRS 463.-490 to 463.530, inclusive.

6. No limited partnership, business trust or organization or other association of a quasi-corporate character shall be eligible to receive or hold any license under this chapter unless all persons having any direct or indirect interest therein of any nature whatsoever, whether financial, administrative, policymaking or supervisory,

are individually qualified to be licensed under the provisions of this chapter.

7. The commission may, by regulation, limit the number of persons who may be financially interested and the nature of their interest in any corporation or other organization or association licensed under this chapter, and establish such other qualifications for licenses as they may, in their discretion, deem to be in the public interest and consistent with the declared policy of the state.

**463.200**

1. Application for a state gaming license or other commission action shall be made to the board on forms furnished by the board and in accordance with the regulations of the commission.

2. The application for a license shall include:

(a) The name of the proposed licensee.

(b) The location of his place or places of business.

(c) The gambling games, gaming device or slot machines to be operated.

(d) The names of all persons directly or indirectly interested in the business and the nature of such interest.

(e) Such other information and details as the board may require in order to discharge its duty properly.

3. The board shall furnish to the applicant supplemental forms, which the applicant shall complete and file with the application. Such supplemental forms shall require, but shall not be limited to, complete information and details with respect to the applicant's antecedents, habits, character, criminal record, business activities, financial affairs and business associates, covering at least a 10-year period immediately preceding the date of filing of the application.

**463.335**

1. As used in this section:

(a) "Gaming employee" means any person connected directly with the operation of a nonrestricted establishment, and includes without limitation:

(1) Boxmen;

(2) Cashiers;

(3) Dealers;

(4) Floormen;

(5) Hosts or other persons empowered to extend credit or complimentary services;

(6) Keno runners;

(7) Keno writers;

(8) Machine mechanics;

(9) Security personnel;

(10) Shift or pit bosses;

(11) Shills; and

(12) Supervisors or managers.

"Gaming employee" does not include bartenders, cocktail waitresses or other persons engaged in preparing or serving food or beverages.

(b) "Nonrestricted establishment" means any establishment except one in which slot machines only are operated incidentally to some other primary business of the licensee.

(c) "Temporary work permit" means a work permit which is valid only for a period not to exceed 30 days from its date of issue and is not renewable.

(d) "Work permit" means any card, certificate or permit issued by the board or by a county or city licensing authority, whether denominated as a work permit, registration card or otherwise, authorizing the employment of the holder as a gaming employee. A document issued by any authority for any employment other than gaming is not a valid work permit for the purposes of this chapter.

2. The legislature finds that, to protect and promote the health, safety, morals, good order and general welfare of the inhabitants of the State of Nevada and to carry out the policy declared in NRS 463.-130, it is necessary that the board:

(a) Ascertain and keep itself informed of the identity, prior activities and present location of all gaming employees in the State of Nevada; and

(b) Maintain confidential records of such information.

3. No person may be employed as a gaming employee unless he is the holder of:

(a) A valid work permit issued in accordance with the applicable ordinances or regulations of the county or city in which his duties are performed and the provisions of this chapter; or

(b) If no work permit is required by either the county or the city, a work permit issued by the board.

A work permit issued to a gaming employee must have clearly imprinted thereon a statement that it is valid for gaming purposes only.

4. Whenever any person applies for the issuance or renewal of a work permit, the county or city officer or employee to whom the application is made shall within 24 hours mail or deliver a copy thereof to the board, and may at the discretion of the county or city licensing authority issue a temporary work permit. If within 30 days after receipt by the board of the copy of the application, the board has not notified the county or city licensing authority of any objection, the authority may in its discretion issue, renew or deny a work permit to the applicant. Any holder of a work permit must obtain renewal of the permit from the issuing agency within 10 days following any change of place of employment.

5. If the board within the 30-day period notifies the county or city licensing authority that the board objects to the granting of a work permit to the applicant, the authority shall deny the work permit and shall immediately revoke and repossess any temporary work permit which it may have issued.

6. Application for a work permit, valid wherever a work permit is not required by any county or city licensing authority, may be made to the board, and may be granted or denied for any cause deemed reasonable by the board.

7. Any person whose application for a work permit has been denied because of an objection by the board or whose application has been denied by the board may apply to the board for a hearing. At the hearing, the board or any designated member of the board or an examiner appointed by the board shall take any testimony deemed necessary. After the hearing the board shall review the testimony taken and any other evidence, and shall within 30 days from the date of the hearing announce its decision sustaining or reversing the denial of the work permit or the objection to issuance of a work permit. The board may object to issuance of a work permit or may refuse to issue a work permit for any cause deemed reasonable by the board. The board may object or refuse if the applicant has:

(a) Failed to disclose, misstated or otherwise attempted to mislead the board with respect to any material fact contained in the application for the issuance or renewal of a work permit;

(b) Knowingly failed to comply with the provisions of chapters 463, 464 or 465 of NRS or the regulations of the Nevada gaming commission at a place of previous employment;

(c) Committed, attempted or conspired to commit any crime of moral turpitude, embezzlement or larceny against his employer or any gaming licensee, or any violation of any law pertaining to gaming, or any other crime which is inimical to the declared policy of this state concerning gaming;

(d) Been identified in the published reports of any federal or state legislative or executive body as being a member or associate of organized crime, or as being of notorious and unsavory reputation;

(e) Been placed and remains in the constructive custody of any federal, state or municipal law enforcement authority; or

(f) Had a work permit revoked or committed any act which is a ground for the revocation of a work permit or would have been a ground for revoking his work permit if he had then held a work permit.

8. Any applicant aggrieved by the decision of the board may, within 15 days after the announcement of the decision, apply in writing to the commission for review of the decision. Review shall be limited to the record of the proceedings before the board. The commission may sustain or reverse the board's decision. The decision of the commission shall be subject to judicial review pursuant to NRS 463.315.

9. All records acquired or compiled by the board or commission relating to any application made pursuant to this section and all lists of persons to whom work permits have been issued or denied and all records of the names or identity of persons engaged in the gaming industry in this state are confidential and shall not be disclosed except in the proper administration of this chapter or to an authorized law enforcement agency.

10. A work permit expires unless renewed within 10 days after a change of place of employment or if the holder thereof is not employed as a gaming employee within the jurisdiction of the issuing authority for a period of more than 90 days.

**463.339**

An application for licensing, registration, finding of suitability, work permit or any approval or consent required by this chapter shall make full and true disclosure of all information to the board, commission or other relevant governmental authority as necessary or appropriate in the public interest or as required in order to carry out the policies of this state relating to licensing and control of the gaming industry.

**463.360**

1. Conviction by a court of competent jurisdiction of the violation of any of the provisions of this chapter may act as an immediate revocation of any and all licenses which may have been issued to the violator, and, in addition, the court may, upon application of the district attorney of the county or of the commission, order that no new or additional license under this chapter be issued to such violator, or be issued to any person for the room or premises in which such violation occurred, for a period of 1 year from the date of such revocation.

2. Any person who willfully fails to report, pay or truthfully account for and pay over any license fee or tax imposed by the provisions of this chapter, or willfully attempts in any manner to evade or defeat any such license fee, tax or payment thereof shall be punished by imprisonment in the state prison for not less than 1 year nor more than 6 years, or by a fine of not more than $5,000, or by both fine and imprisonment.

3. The violation of any of the provisions of this chapter, the penalty for which is not herein specifically fixed, is a gross misdemeanor.

**463.530**

All officers and directors of the corporation which holds or applies for a state gaming license must be licensed individually, according to the provisions of this chapter, and if, in the judgment of the commission, the public interest will be served by requiring any or all of the corporation's individual stockholders, lenders, holders of evidence of indebtedness, underwriters, key executives, agents or employees to be licensed, the corporation shall require such persons to apply for a license in accordance with the laws and requirements in effect at the time the commission requires such licensing. A person who is required to be licensed by this section shall apply for a license within 30 days after he becomes an officer or director. A person who is required to be licensed pursuant to a decision of the commission shall apply for a license within 30 days after the commission requests him to do so.

Nev.Rev.Stat. § 463.360 (in effect from July 1, 1979 until July 1, 1981):

**463.360**

1. Conviction by a court of competent jurisdiction of a person for a violation of, an attempt to violate, or a conspiracy to violate any of the provisions of this chapter or of chapter 464 or 465 of NRS may act as an immediate revocation of all licenses which have been issued to the violator, and,

in addition, the court may, upon application of the district attorney of the county or of the commission, order that no new or additional license under this chapter be issued to such violator, or be issued to any person for the room or premises in which such violation occurred, for a period of 1 year from the date of such revocation.

2. Any person who willfully fails to report, pay or truthfully account for and pay over any license fee or tax imposed by the provisions of this chapter, or willfully attempts in any manner to evade or defeat any such license fee, tax or payment thereof shall be punished by imprisonment in the state prison for not less than 1 year nor more than 6 years, or by a fine of not more than $5,000, or by both fine and imprisonment.

3. Except as provided in subsection 4, any person who willfully violates, attempts to violate, or conspires to violate any of the provisions of subsection 1 of NRS 463.160 shall be punished by imprisonment in the state prison for not less than 1 year nor more than 20 years, by a fine or not more than $50,000, or by both fine and imprisonment.

4. A licensee who puts additional games or slot machines into play or displays additional games or slot machines in a public area without first obtaining all required licenses and approval is subject only to the penalties provided in NRS 463.310 and in any applicable ordinance of the county, city or town.

5. The violation of any of the provisions of this chapter, the penalty for which is not specifically fixed in this chapter, is a gross misdemeanor.

Nev. Gaming Comm'n Regs. 3.080, 3.100, 3.110, 8.010, 15.1594–6 (1980):

**3.080 Unsuitable affiliates.** The commission may deny, revoke, suspend, limit, condition or restrict any registration or finding of suitability or application therefor upon the same grounds as it may take such action with respect to licenses, licensees and licensing; without exclusion of any other grounds. The commission may take such action on the grounds that the registrant or person found suitable is associated with, or controls, or is controlled by, or is under common control with, an unsuitable person.

(Adopted: 9/73.)

**3.100 Employee report.**

1. Annually, on or before the 15th of July, each nonrestricted licensee, as defined in Reg. 4.030.1(b), shall submit an employee report to the board on a form to be furnished by the board. The report shall identify every individual who is directly or indirectly engaged in the administration or supervision of the gaming operations or physical security activities of such nonrestricted licensee. The following classes of gaming employees are presumed to be actively and directly engaged in the administration or supervision of gaming:

(a) All individuals who are compensated in any manner in excess of $40,000 per annum;

(b) All individuals who may approve or extend gaming credit in any amount, or whose recommendations in this regard are ordinarily sought or followed;

(c) All individuals who have authority to hire or terminate casino personnel;

(d) All individuals who have the authority to supervise or direct a shift of any gaming or security activity, including but not limited to supervision or direction of the pit area, keno or bingo games, slot machines, race or sports books, pari-mutuel operations, or any persons having authority to supervise or direct such persons;

(e) All individuals who regularly participate in the count more frequently than 1 day in each week or who actually participate in the count more than 10 days in any 30-day period;

(f) All individuals who may approve or extend to casino patrons complimentary house services other than beverages only;

(g) All individuals who supervise or direct other employees engaged in the control of gaming assets and revenues and record keeping, including the recording of cash and evidences of indebtedness, and

the maintenance, review or control of the records, accounts, and reports of transactions which are required to be kept pursuant to Reg. 6;

(h) Any individual who has been specifically represented to the board or commission by a licensee or any officer or director thereof as being important or necessary to the operation of the gaming establishment;

(i) All individuals who individually or as part of a group formulate management policy.

2. The annual employee report shall also include a description of the gaming duties, casino responsibilities, and casino authority delegated to each individual identified in the report.

3. Any changes, additions, or deletions to any information contained within the annual employee report which occurs subsequent to the filing of the report and prior to the filing of the report for the next calendar year shall be reported to the board in writing no less than 10 days after the end of the calendar quarter during which the change, addition, or deletion occurred.

4. The annual employee report and subsequent reports of changes, additions, or deletions shall be confidential and may not be disclosed except upon order of the commission or pursuant to the terms of NRS 463.130.

(Adopted: 7/76.)

### 3.110 Key employee.

1. Any executive, employee, or agent of a gaming licensee having the power to exercise a significant influence over decisions concerning any part of the operation of a gaming licensee or who is listed or should be listed in the annual employee report required by Reg. 3.100 is a key employee.

2. Whenever it is the judgment of at least 3 members of the commission that the public interest and the policies set forth in Nevada Revised Statutes Chapter 463, the Nevada Gaming Control Act, will be served by requiring any key employee to be licensed, the commission shall serve notice of such determination upon the licensee. The commission shall not be restricted by the title of the job performed but shall consider the functions and responsibilities of the person involved in making its decision as to key employee status. Grounds for requiring licensing of a key employee which are deemed to serve the public interest and the policies of the Nevada Gaming Control Act include but are not limited to the following:

(a) The key employee is new to the industry, to the particular gaming establishment, the position, or the level of influence or responsibility which he has and the board or commission has little or outdated information concerning his character, background, reputation, or associations, or

(b) Information has been received by the board or commission which, if true, would constitute grounds for a finding of unsuitability to be associated with a gaming enterprise.

3. The licensee shall, within 30 days following receipt of the notice of the commission's determination, present the application for licensing of the key employee to the board or provide documentary evidence that such key employee is no longer employed by the licensee. Failure of the licensee to respond as required by this section shall constitute grounds for disciplinary action.

4. Any individual whose application for licensing as a key employee is required pursuant to this regulation may request the commission in writing to review its determination of that individual's status within the gaming organization any time within 10 days following the filing of a completed application as required by this regulation. In the event the commission determines that the applicant is not a key employee or that the public interest and policies of the Nevada Gaming Control Act do not require the licensing of the key employee at this time, then the key employee applicant shall be allowed to withdraw his application and he may continue in his employment. In no event shall the request of the key employee applicant for review

stay the obligation of the licensee to present the key employee's application within the 30-day period herein proscribed.

(Adopted: 7/76. Amended: 5/77.)

**8.010 General.**

1. No person shall sell, purchase, assign, lease, grant or foreclose a security interest, hypothecate or otherwise transfer, convey or acquire in any manner whatsoever any interest of any sort whatever in or to any licensed gaming operation or any portion thereof, or enter into or create a voting trust agreement or any other agreement of any sort in connection with any licensed gaming operation or any portion thereof, except in accordance with law and these regulations.

2. No licensee shall permit any person to make any investment whatever in, or in any manner whatever participate in the profits of, any licensed gaming operation, or any portion thereof, except in accordance with law and these regulations.

3. No person shall transfer or convey in any manner whatsoever any interest of any sort whatever in or to any licensed gaming operation, or any portion thereof, to, or permit any investment therein or participation in the profits thereof by, any person acting as agent, trustee or in any other representative capacity whatever for or on behalf of another person without first having fully disclosed all facts pertaining to such representation to the board. No person acting in any such representative capacity shall hold or acquire any such interest or so invest or participate without first having fully disclosed all facts pertaining to such representation to the board and obtained written permission of the board to so act.

4. Regulation 8 shall apply to transfers of interest in corporations subject to Reg. 15, but shall not apply to transfers of interest in corporations subject to Reg. 16.

(Amended: 9/73.)

**15.1594–6 Prohibition with respect to ownership of corporate licensees.** No person shall acquire any equity security issued by a corporate licensee or a holding company, nor become a controlling affiliate of a corporate licensee or a holding company, nor become a holding company of a corporate licensee or a holding company without first obtaining the prior approval of the commission in accordance with Regulations 4 and 8.

(Effective: 9/73.)