**UNITED STATES of America, Appellee,**

v.

**Dell L. POOLER, Appellant.**

**No. 91–3035.**

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 14, 1992.

Decided April 15, 1992.

Donald A. Wine, Des Moines, Iowa, argued, for appellant.

Judith A. Whetstine, Cedar Rapids, Iowa, argued, for appellee.

Before ARNOLD, Chief Judge, HEANEY, Senior Circuit Judge, and MAGILL, Circuit Judge.

HEANEY, Senior Circuit Judge.

A jury found Dell L. Pooler guilty of making a false bank entry in violation of 18 U.S.C. § 1005, and the district court sentenced Pooler to fifteen months imprisonment. Pooler appeals his conviction, the evidentiary admission of prior bad acts, and his sentence. We affirm.

## FACTS

Pooler was the former president of the Bellevue (Iowa) State Bank. Beginning in 1982, the Iowa Department of Banking became concerned with the bank's lack of working capital. The regulators were particularly alarmed that the bank had $475,-000, representing 45 percent of its capital, invested in BX–100, a brake valve manufacturer which Pooler incorporated and directed but which was actively managed by Leo Reistroffer. Reacting to pressure from the regulators, the bank agreed to a cease and desist order, requiring the bank to repossess and sell the BX–100 building and inventory[1] and forbidding the bank from financing BX–100 in the future.

Although the bank claims to have complied with the cease and desist order, it appears that Reistroffer continued to operate BX–100 with the bank's assistance. The bank provided this assistance by loaning money to Reistroffer who first deposited the money into a company he owned, Promotional Merchandise Company, and then transferred the money into the accounts of BX–100. This loan laundering appears to have taken place from November 1984 until September 1986. In October 1986, the bank and Reistroffer agreed to an informal lease, permitting Reistroffer to operate both his Bellevue Manufacturing Company, a producer of musical door chimes, and BX–100 in the BX–100 building in exchange for Reistroffer's taking care of maintenance, repairs, and utilities, while the bank paid for the building's insurance, taxes, and heat.

Early in 1988, representatives of Rockwell International scouted Bellevue for an industrial location. Rockwell eventually decided to lease the BX–100 building from the bank beginning April 1, 1988. When Reistroffer learned of this development, he told the bank that if it forced him out of the BX–100 building, the disruption would prevent him from repaying a $38,500 loan he owed the bank. To gain Reistroffer's cooperation in vacating the building, on March 21, 1988, the bank advanced Reistroffer the $40,000 necessary to pay off his $38,500 note. In exchange, the bank received Reistroffer's cooperation in immediately vacating the building as well as the building's furniture and fixtures and the brake parts remaining in the building. The bank recorded the transaction in its books as involving "bank's furniture and fixtures," and Reistroffer used the funds he received to satisfy his debt with the bank.[2] A year later, Rockwell International purchased the building and the furniture and fixtures from the bank.

In October 1988, the Federal Deposit Insurance Corporation (FDIC) examined the bank's records and discovered the entry concerning the $40,000 purchase of furniture from Leo Reistroffer. A flurry of activity ensued. The FDIC instructed the bank to obtain a bill of sale from Reistroffer. According to Pooler, Reistroffer refused to cooperate. Pooler responded to Reistroffer's intransigence by telling the FDIC that the $40,000 actually purchased brake parts and possession of the building. In a settlement to foreclose civil actions against him, Pooler purchased the brake parts from the bank for $40,000 plus accrued interest. Later, however, with the support of tax documents, Pooler reverted

---

1. In 1981 the bank secured a warranty deed for the BX–100 building in Bellevue, because BX–100 could not perform certain commitments it had made to the bank.

2. Pooler argues, and the government does not dispute, that the recording should have read something to the effect of "Reistroffer's furniture and fixtures."

to his original position that the $40,000 primarily enabled the bank to purchase furniture and fixtures from Reistroffer.

An indictment charged Pooler with falsely entering in the bank records that the $40,000 payment to Reistroffer purchased furniture and fixtures when Pooler actually knew that the $40,000 did not purchase anything from Reistroffer. A jury found Pooler guilty as charged, and after calculating his guidelines offense level to be 14, the district court sentenced Pooler to fifteen months imprisonment.

## DISCUSSION

### I. Conviction

▮ Pooler first argues that the district court erred in refusing to grant his motion for acquittal. We disagree.

"A motion for judgment of acquittal should be granted only where the evidence, viewed in the light most favorable to the government, is such that a reasonably minded jury must have a reasonable doubt as to the existence of any of the essential elements of the crime charged." *United States v. Mundt*, 846 F.2d 1157, 1158 (8th Cir.1988) (citation omitted). To establish a violation of 18 U.S.C. § 1005, the government must prove that a false entry was made in a bank's record with the intent to deceive.

Pooler directed an entry in the bank's record to reflect that the bank purchased furniture and fixtures from Reistroffer for $40,000 on March 21, 1988. In order for this to be an accurate reflection, Reistroffer must have owned the furniture and fixtures. BX-100 purchased the furniture in question in 1981. Pooler contends that before March 21, 1988, BX-100 transferred the furniture to Bellevue Manufacturing Company, which was owned by Reistroffer, in exchange for a $40,000 offset against amounts owed to Bellevue Manufacturing.

The tax records documenting this exchange list it as having occurred on April 30, 1988, which was nine days after the bank supposedly purchased the furniture and fixtures from Reistroffer. The ac-

countant who prepared the tax return testified that he was not certain that the transfer occurred on April 30, that he was not certain that the transaction could be documented, that all he knew was that the transfer occurred sometime between October 1, 1987, and May 31, 1988, which was the period covered by the tax return, and that he based his information on what Reistroffer told him.[3] Reistroffer's secretary/bookkeeper testified that Reistroffer or Bellevue Manufacturing never purchased or owned the furniture or fixtures and that when Reistroffer received the $40,000 on March 21, 1988, he instructed her "to put it in the books to make it look like he purchased the BX-100 furniture," although her understanding was that he received the money "to pay back the loans he owed at the bank that was borrowed in his name for BX-100."

This testimony indicates that Leo Reistroffer never owned the furniture or fixtures. The only evidence suggesting ownership was the testimony of the accountant that Reistroffer told him that he gained ownership of the furniture from BX-100. The accountant discounted his own testimony, however, when he admitted that he was not certain the furniture transfer could be documented, and further undermined Pooler's case by officially claiming (for tax purposes) that Reistroffer gained ownership of the furniture on April 30, 1988, while Pooler claimed that the bank bought the furniture from Reistroffer on March 21, 1988. Viewing this evidence in the light most favorable to the government, we are not convinced that a reasonable jury must reasonably doubt that Pooler directed the bank entry to be made with an intent to deceive.

### II. Admission of Evidence

▮ Pooler next argues that the district court erred in admitting evidence regarding Pooler's history of questionable banking practices. Pooler argues on appeal that the evidence of his prior bad acts was not related to "motive, opportunity, intent,

---

**3.** Leo Reistroffer died on May 6, 1989, and   therefore could not testify at trial.

preparation, plan, knowledge, identity, or absence of mistake or accident" as required by Federal Rule of Evidence 404(b), but instead was introduced to assassinate his character and to focus the jury's attention on false issues. *See United States v. Clemons,* 503 F.2d 486, 489–90 (8th Cir. 1974). We disagree.

We find that the contested evidence "and the evidence of the crime charged are inextricably intertwined," and therefore, the contested evidence "is not extrinsic and Rule 404(b) is not implicated." *United States v. DeLuna,* 763 F.2d 897, 913 (8th Cir.1985) (citations omitted). In this situation, the trial court has broad discretion, "and will be reversed only where the evidence 'clearly has no bearing upon any of the issues involved,'" or where the evidence's prejudicial effect outweighs its probative value. *Id.* (quoting *United States v. Wagoner,* 713 F.2d 1371, 1375 (8th Cir. 1983)).

To prove a violation of 18 U.S.C. § 1005, the government must show that a false entry was made in bank records with an intent to deceive. Here, the jury concluded that Pooler intended to deceive bank examiners by disguising the true nature of the $40,000 payment to Reistroffer. Evidence regarding Pooler's prior confrontations with bank examiners, the bank's defiance of cease and desist orders, the bank's continued involvement with BX–100, and Pooler's relationship with and, most importantly, his need to funnel loans through Reistroffer was necessary to demonstrate why Pooler had to disguise the $40,000 payment via a false bank entry. "This evidence, therefore, is probative of the crime charged and is not evidence of other crimes or wrongful acts." *Id.*[4]

Given the probative value of this evidence, we do not believe the district court abused its discretion by admitting it. Indeed, the district court suggested to Pooler

that he minimize the prejudicial effect of this evidence by submitting a limiting instruction, but Pooler failed to submit such an instruction. Pooler also did not object to a jury instruction which directed the jury to use the evidence regarding Pooler's earlier unsound banking practices to determine his knowledge or intent with respect to the charged crime.[5]

### III. Sentence

Pooler finally contests the computation of his guidelines sentence. Pooler concedes a base offense level of six. He objects, however, (1) to the district court adding four points based on a finding that the bank lost $40,000 under U.S.S.G. § 2F1.1(b)(1)(E), (2) to the district court's two-level enhancement for more than minimal planning under U.S.S.G. § 2F1.1(b)(2)(A), and (3) to receiving a two-level enhancement for abusing a position of trust under U.S.S.G. § 3B1.1. Pooler further argues that the district court erred in refusing to depart downward.

Each of these determinations depended upon applying the guidelines to the facts of this case. While we are concerned about the application of the more-than-minimal-planning enhancement to an offense which was in one sense committed by a simple book entry, the district court found otherwise. In sum, its conclusions with respect to this enhancement and to the other guidelines issues are not clearly erroneous.

Accordingly, we affirm Pooler's conviction and sentence.

---

4. As for the remaining evidence, namely details of the bank's entertainment expenses, to which Pooler objects, we hold that its introduction was harmless error. *See Dowling v. United States,* 493 U.S. 342, 110 S.Ct. 668, 671, 675, 107 L.Ed.2d 708 (1990).

5. This instruction forbade the jury from using the evidence of prior unsound banking practices "to decide whether the defendant carried out the acts involved in the crime charged here," and from convicting Pooler "simply because you believe he may have committed acts described as unsound banking practices in the past."